No. 75,608

STATE OF KANSAS, *Appellee*, v. ROBERT L. JACKSON, *Appellant.*

(936 P.2d 761)

120

Opinion filed April 18, 1997.

*Rick Kittel*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*James A. Brown*, assistant district attorney, argued the cause, and *Michelle V. Hostetler*, assistant district attorney, *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Robert L. Jackson was convicted of two counts of first-degree murder, one count of voluntary manslaughter, two counts of aggravated battery, one count of unlawful possession of a firearm, one count of criminal damage to property, and one count of criminal trespass. All but the misdemeanor sentences were imposed to run consecutively. Defendant appeals his convictions and sentences, claiming the trial court erred by (1) failing to instruct on self-defense; (2) failing to instruct on lesser included offenses; (3) instructing the jury on first- and second-degree murder; (4) denying a change of venue; (5) imposing an upward durational departure sentence; (6) imposing the sentence for aggravated battery; (7) imposing a consecutive sentence for unlawful possession of a firearm; and (8) sentencing him for level 8 aggravated battery.

At approximately 12:45 a.m. on April 8, 1994, Robert Jackson left the home of Jamie Brown for Shanghi Lil's, a nightclub in Topeka, Kansas. As Jackson left, Brown noticed Jackson had a gun.

Tracy Freel and Heidi Childers, dancers at a nightclub called Teezers, went to Shanghi Lil's to meet Childers' boyfriend, Scott Wilson, who worked there as a bouncer. At Shanghi Lil's, Childers and Freel were approached by Jackson, who tried to pick them up.

Jackson also made comments of a sexual nature to Childers, Freel, and other women in the club. After an announcement that the club was closing, Jackson lingered at the bar and attempted to persuade Childers and Freel to leave with him. They declined.

When Matt Fabry, a bouncer at the club, told Jackson it was time to leave the club because the club was closing, Jackson refused to leave. Fabry grabbed Jackson by the shoulder to escort him out and again told Jackson to leave. Jackson struck Fabry and knocked him to the floor.

As Jon Stratton, a patron at the club, intervened to assist Fabry, Jackson took a black automatic pistol from his waistband and shot Fabry in the chest and arm. Fabry was unarmed. Jackson then shot Stratton in the right side. Dan Rutherford, the club's disc jockey, jumped over a brass rail to assist Fabry. Jackson shot Rutherford twice in the face. Jackson backed out of the inner doors of the club, returned, and shot Rutherford two or three more times. Jackson then straddled the fallen Fabry and asked, "You want some more of this, motherfucker?"

When Scott Wilson attempted to push Jackson out the door, Jackson started firing again. Alan Eastman, a customer, attempted to escape out the door. Jackson turned and shot Eastman in the thigh. After Jackson shot Eastman, the club manager, John Iturralde, left his office in the back of the club carrying a .45 caliber handgun. After more shots were fired by Jackson, Iturralde took cover behind the bar. Iturralde testified that he never fired his gun.

Wilson threw Childers to the floor to protect her, and she landed next to Jon Stratton. While on the floor, she felt a burning and stinging on her leg and saw a bruise forming across her right leg going over to her left leg and a tear in her knee.

Brenda Strahm, an acquaintance of Jackson's, heard a loud noise at her front door in the early morning hours of April 8, 1994. She opened the door and saw Jackson standing there. She let Jackson in and returned to her bedroom. Later she heard a gunshot. After Jackson fell asleep in Strahm's kitchen, she took her children, left the house, went to a nearby service station, and called 911. The police found Jackson asleep in Strahm's house, arrested him, and confiscated a 9 mm Taurus handgun found next to Jackson.

The police also found an empty 9 mm Norinco handgun underneath Dan Rutherford's body at the club. Seven cartridges fired from the Norinco were found at the club. A total of 21 shell casings were recovered. Hugh Kizer, a KBI firearms expert who testified at trial regarding the ballistics evidence, stated that at least 15 of the 21 spent cartridges found in the club were fired by a 9 mm Taurus pistol and 7 of the shell casings were fired by a Norinco handgun. The evidence was inconclusive as to whether the bullets and bullet fragments recovered after the incident were fired from the Norinco or the Taurus handgun.

Dr. Eric Mitchell performed post mortem examinations on the three persons killed during the shooting. Jon Stratton died from a single bullet wound. The bullet which killed Stratton came from the Norinco. Matt Fabry sustained bullet wounds to the right arm, chest, and right side. A bullet fragment taken from Fabry's body was fired by the Norinco handgun. Dan Rutherford sustained multiple wounds to his left hand, face, right arm, right armpit, as well as three wounds to the right side of his chest and wounds to his right hand and left arm. Analysis of bullets taken from Rutherford's body indicated they had not been fired by the Norinco handgun and tests were inconclusive regarding the Taurus handgun.

Prior to trial, Jackson pled to unlawful possession of a firearm. Jackson presented no evidence at trial and did not allege someone else shot the victims. Jackson was convicted of the first-degree murders of Matt Fabry and Dan Rutherford and voluntary manslaughter of Jon Stratton. He was also convicted of aggravated battery of Alan Eastman, aggravated battery of Heidi Childers, unlawful possession of a firearm, misdemeanor criminal damage to property, and criminal trespass.

## I. SELF-DEFENSE

Jackson argues the district court erred by failing to instruct the jury on self-defense as to the shooting and deaths of Matt Fabry, Dan Rutherford, and Jon Stratton. It is the duty of the trial court to instruct the jury on self-defense so long as there is evidence tending to establish self-defense. *State v. Hill*, 242 Kan. 68, 78, 744 P.2d 1228 (1987); *State v. Smith*, 161 Kan. 230, 237, 167 P.2d 594

(1946). In order to rely on self-defense as a defense, a person must have a belief that the force used was necessary to defend himself and, also, show the existence of facts that support such a belief. *State v. Childers*, 222 Kan. 32, 48, 563 P.2d 999 (1977).

Jackson's claim that he was entitled to a self-defense instruction ignores the statutory requirements for giving a self-defense instruction. K.S.A. 21-3211 provides: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force." However, K.S.A. 21-3214(3) states that the justification for using force in self-defense is not available to a person who:

"Otherwise initially provokes the use of force against himself or another, unless:

"(a) He has reasonable ground to believe that he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

"(b) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force."

Here, it was uncontroverted that Jackson was the initial aggressor. The facts indicated that Jackson was told to leave the club more than once. After Fabry placed his hand on Jackson and asked Jackson to leave the club, Jackson struck and then shot the unarmed Fabry. After shooting Fabry, Jackson then shot Rutherford and Stratton as they came to assist Fabry. Fabry and Stratton were unarmed. Although there is evidence that Rutherford had a gun, there was no testimony that Rutherford fired the gun. Jackson, the initial aggressor, made no effort to withdraw, escape, or avoid the killings. Jackson's claim that he was entitled to a self-defense instruction is without merit.

In addition, Jackson argues that the district court erred in submitting instructions on the second-degree murders of Fabry and Rutherford as lesser included offenses of first-degree murder by failing to include the statement as to self-defense found in PIK Crim. 3d 56.03. He makes a similar argument as to the court's instruction on voluntary manslaughter. Because we have deter-

mined that there was no evidence justifying a self-defense instruction, that determination is dispositive of these issues.

## II. LESSER INCLUDED OFFENSE

Defendant next contends the trial court erred in failing to instruct the jury on involuntary manslaughter with respect to the killing of Jon Stratton. The defendant in a criminal prosecution has a statutory right to have the court instruct the jury on all lesser included offenses established by substantial evidence. The question is not whether, in the mind of the court, the evidence as a whole excludes the idea that the defendant is guilty of a lesser degree of the offense charged, but whether there is substantial evidence tending to prove a lesser degree of the offense. If there is, then the question of such degree should be submitted to the jury. *State v. Deavers*, 252 Kan. 149, 154-55, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993). There is some weighing of evidence in this analysis, but the weighing of evidence is not a retrial of the case. *State v. Dixon*, 252 Kan. 39, 43, 843 P.2d 182 (1992).

K.S.A. 21-3404 provides in part:

"Involuntary manslaughter is the unintentional killing of a human being committed:
"(a) Recklessly; [or]
. . .
"(c) during the commission of a lawful act in an unlawful manner."

Jackson relies on these two theories of involuntary manslaughter described in K.S.A. 21-3404, namely that the killing of Jon Stratton was (1) unintentional and reckless or (2) committed during the commission of a lawful act (self-defense) done in an unlawful manner. Because we have determined that there was no evidence justifying Jackson's theory of self-defense, the second theory has no merit.

As to the unintentional or reckless claim, Stratton was killed by a single gunshot. Was there evidence to support the assertion that the shooting of Jon Stratton was reckless and required the giving of an instruction on involuntary manslaughter? K.S.A. 21-3201(c) defines "reckless conduct" as "conduct done under circumstances that show a realization of the imminence of danger to the person

of another and a conscious and unjustifiable disregard of that danger."

Defendant's assertion that the killing of Stratton was unintentional and reckless is based solely upon testimony of Scott Wilson. Wilson testified that after Jackson shot Fabry, Stratton ran by Wilson and Jackson was "still firing and shooting and everything." Jackson theorizes that based upon Wilson's testimony, Stratton may have been killed by a random shot and, to support his argument, points out that he was convicted of reckless conduct (aggravated battery) in the shooting of Heidi Childers. Wilson, however, never testified that Jackson shot randomly. Wilson stated Jackson had not changed his position while shooting. Wilson could not tell where or at what Jackson was shooting. Wilson's testimony is not sufficiently substantial to have required the trial court to instruct on involuntary manslaughter in the killing of Stratton.

Furthermore, Childers, who was shot while lying on the floor to protect herself, was not a participant in the incident as Stratton was. After Jackson shot Fabry, Stratton came to Fabry's aid by grabbing Jackson around the arms and chest. One witness testified that after Jackson shot Fabry and Rutherford, Stratton started to run away from Jackson. Jackson then shot Stratton in the right side. Based upon these facts, there was insufficient evidence that the killing of Jon Stratton was unintentional or reckless and, therefore, an instruction on involuntary manslaughter was not required.

## III. FIRST- AND SECOND-DEGREE MURDER INSTRUCTION

Jackson next argues that the court erred in instructing the jury on first- and second-degree murder. No party may assign as error the giving of an instruction unless he or she objects before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds for the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). The giving of an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that absent the alleged error there was a real possibility the jury would have returned a different verdict. *State v. DePriest*, 258 Kan. 596, 605, 907 P.2d 868 (1995); *State v.*

*Crawford*, 255 Kan. 47, Syl. ¶ 5, 872 P.2d 293 (1994). Jackson did not object to the giving of these instructions at trial; therefore, the clearly erroneous standard applies.

First, Jackson contends the trial court incorrectly stated the elements of first-degree murder by including malice as an element of the crime. The court's instructions on each of the first-degree murder counts stated that to establish the charge, each of the following claims must be proved:

"1. That the defendant intentionally killed [the victim]; and

"2. That such killing was done maliciously, deliberately and with premeditation; and

"3. That this act occurred on or about the 8th day of April 1994, in Shawnee County, Kansas."

The trial court failed to note that effective July 1, 1993, the Kansas Legislature amended the first-degree murder statute by removing the word "maliciously" from the definition of first-degree murder. L. 1992, ch. 298, § 3. The trial court mistakenly used PIK Crim. 2d 56.01 rather than PIK Crim. 3d 56.01, which reflected the legislative change. Jackson claims the instruction given was improper and misled the jury because it contained the element of malice which was not a statutory element of the crime of first-degree murder on April 8, 1994.

After reviewing all the instructions, we note that the jury was instructed that to establish a charge, "each of the following claims" must be proved. The court instructed the jury that for the defendant to be guilty of first-degree murder, second-degree murder or voluntary manslaughter, the State had to prove intentional conduct and defined the terms "intentional" and "deliberately and with premeditation" in Instruction No. 15. The court defined the term "maliciously" as "willfully doing a wrongful act without just cause or excuse." Under the circumstances, the court's inclusion of the word "maliciously" in the definition of first-degree murder did not change the elements of the offense. Even though the court's instruction did not conform to the statute applicable at the time of the murder, the error did not affect the rights of the defendant or misstate the law.

Jackson next complains that the trial court instructed the jury that the elements of second-degree murder were (1) an intentional killing (2) not done upon a sudden quarrel or in the heat of passion. This instruction follows PIK Crim. 3d 56.03. Jackson argues that the instruction given was erroneous because K.S.A. 1993 Supp. 21-3402, which defined second-degree murder, contained no element precluding the existence of a sudden quarrel or heat of passion.

Jackson asserts that by incorrectly instructing on second-degree murder, the jury was confused and misled to believe that the primary difference between first- and second-degree murder was not premeditation but whether the killing resulted from a sudden quarrel or heat of passion. He claims that this error could have resulted in the jury convicting him of first-degree murder even if premeditation was not proved.

To support his argument, Jackson points to markings made on the court's instructions during jury deliberations. On instruction 5, defining the first-degree murder of Fabry, there was a "T" placed next to the element for intentional killing but no mark next to the elements of malice, deliberation, or premeditation. On Instruction No. 6, defining second-degree murder for the killing of Fabry there was another "T" placed next to the element alleging an intentional killing, but an "F" beside the element alleging that the killing was not done upon a sudden quarrel or in the heat of passion. Jackson extrapolates from these markings that the jury believed that a sudden quarrel or heat of passion existed and, therefore, that a first- or second-degree murder conviction was improper.

Jackson's argument based upon these markings is highly speculative. First, the markings were made only on the instructions dealing with Count I (Fabry) and not on the instructions dealing with the murders of Rutherford and Stratton. Second, Jackson somehow claims that these markings represent conclusions made by the jury, when they may merely represent notations made during the course of deliberations.

The proper inquiry is not speculation as to what these marks may have meant, but whether the court's instructions given to the jury were clearly erroneous. The law is well settled that upon review of a challenged jury instruction, the instructions are to be

considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error, although they may be in some small way erroneous. *State v. Johnson*, 255 Kan. 252, Syl. ¶ 4, 874 P.2d 623 (1994).

The jury was instructed on first-degree murder, second-degree murder, and voluntary manslaughter as to each of the three murders. The Notes to PIK Crim. 3d 56.03 state that the element that the killing was not done in the heat of passion or upon a sudden quarrel should be added where there is evidence which requires an instruction on voluntary manslaughter. Apart from the inclusion of the element of malice in the first-degree murder instruction, the court's instructions conformed with PIK. The instructions as given fairly stated the law on first- and second-degree murder and were not clearly erroneous.

## IV. CHANGE OF VENUE

Jackson argues that the trial court erred in denying his motion for change of venue because pretrial publicity and the nature of the publicity so prejudiced the community it was impossible for him to receive a fair trial.

K.S.A. 22-2616(1) provides:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

The determination of whether to change venue is entrusted to the sound discretion of the trial court; its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality. The State is not required to produce evidence refuting that of the defendant. The defendant must show that such prejudice exists in the community and that it is reasonably certain he or she will not obtain a fair trial. *State v. Shannon*, 258

Kan. 425, Syl. ¶ 5, 905 P.2d 649 (1995). See *State v. Butler*, 257 Kan. 1043, Syl. ¶ 2, 897 P.2d 1007 (1995); *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 2, 845 P.2d 609 (1992); *State v. Grissom*, 251 Kan. 851, 927-29, 840 P.2d 1142 (1992).

Indicative of whether the atmosphere is such that a defendant's right to a fair trial would be jeopardized, courts have looked at such factors as the particular degree to which the publicity circulated throughout the community; the degree to which the publicity or that of a like nature circulated in other areas to which venue could be changed; the length of time which elapsed from the dissemination of the publicity to the date of trial; the care exercised and the ease encountered in the selection of the jury; the familiarity with the publicity complained of and its resultant effect, if any, upon the prospective jurors or the trial jurors; the chanllenges exercised by the defendant in the selection of a jury, both peremptory and for cause; the connection of government officials with the release of the publicity; the severity of the offense charged; and the particular size of the area from which the venire is drawn. *State v. Ruebke*, 240 Kan. 493, 499-500, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987) (citing Annot., 33 A.L.R.3d 17, § 2[a]).

Prior to trial, Jackson filed a motion for change of venue. Attached to the motion was a report prepared by professional consultants summarizing the results of a telephone survey of community awareness of the case. The survey population of registered voters included eligible jurors in Shawnee County who were not currently on jury service. Three hundred one respondents were drawn from the sample population. The sample included respondents from 18 to 96 years of age. Ninety-two percent of the respondents were white and approximately seven percent were minorities.

The survey which addressed the public's awareness of the incident and the impact of that awareness on juror bias indicated that 89.7% of the respondents recalled hearing or reading about the incident. When asked a second question containing some specifics of the case, 16.3% of those who did not recall the incident when asked the first question recalled the incident. Eighty-two percent of the respondents were able to recall and describe some specifics

about the incident. The report concluded that specificity of recollection indicated that the respondents' memories regarding the case were vivid and resistant to change. More than 60% of the respondents had already decided that Jackson was probably or definitely guilty, as compared with only 2% who believed him probably or definitely not guilty.

University of Kansas Professor Lawrence Wrightsman, who assisted in designing the survey, had prepared an affidavit summarizing the results. In the affidavit, Professor Wrightsman stated:

"[P]retrial publicity that is negative to the defendant continues to have an impact on the jurors, throughout the trial and during the deliberation phase. Research has shown that subjects, like jurors, will use information they receive prior to the trial to form a coherent impression of a target person, such as a defendant, and this information then influences their subsequent judgments."

Finally, the affidavit concludes:

"[T]he attentiveness of the population to the local media, the high level of awareness of this case, and the strong level of anti-defendant reactions lead me to draw two conclusions. First, coverage in the local media was highly one-sided and sensationalized. Second, the quantity and quality of bias engendered by that coverage makes it extremely difficult to select an unbiased jury from this population."

The court took the matter under advisement and ultimately denied the motion for change of venue, citing the expense of moving the trial, the fact no news stories had appeared in the press for over 6 months preceding the trial, and that most of the pretrial publicity occurred within a few days of the incident. The court noted that the survey was taken from a sample of registered voters rather than from a sample of licensed drivers. The court pointed out that Shawnee County jurors are selected from a list of licensed drivers. The court then stated that it had reviewed the media coverage of this incident and found it not to be significantly sensationalized. The court noted that of the 63% of the sample who believed the defendant to be guilty, none were asked a follow-up question regarding whether they would be able to disregard anything learned from the news if they were selected as jurors. Finally, the court determined that the jury panel should be screened by means of questionnaires and voir dire questioning.

Pursuant to the order of the court, potential jurors completed questionnaires. The questionnaire asked whether the jurors had heard or seen news reports of the incident; what recollection of the incident they had; whether the jurors had discussed this case with anyone; whether the jurors knew Bobby Jackson, the victims, or their families; whether the jurors had any opinion about Jackson's guilt or innocence; whether the jurors had ever heard anyone express an opinion about this case; whether the jurors could disregard any prior knowledge they had about the case and decide the case based upon the evidence presented at trial; whether jury service would cause the jurors any great inconvenience; and whether the jurors held any personal beliefs which would prevent them from sitting in judgment and reaching a verdict.

The court and both counsel reviewed these questionnaires prior to voir dire questioning and excused a number of the potential jurors solely based upon their written answers. On the first panel, jurors indicating that they would not be able to put aside their prior knowledge about the case and decide it based solely upon the evidence at trial were excused for cause.

A significant number of jurors in the second panel was also excused based solely upon the questionnaires. Again, many of these jurors indicated that they had formed an opinion about Jackson's guilt or innocence and that they would not be able to put aside their prior knowledge of the case and decide the matter based on the evidence. Several other jurors were dismissed during voir dire questioning, one because of his inability to ignore the news stories.

Jackson argues that it is significant that, of the 30 jurors who were excused for cause, 13 expressed an incorrect belief that he had been kicked out of the club and later returned with a gun and started shooting. Jackson theorizes that this incorrect information came from media reports. Jackson asserts: "This type of incorrect information is important, because according to the findings of the professionals involved in the survey, such information has an impact on the jurors and tends to stay in the juror's [sic] minds, even through deliberation on a verdict."

We note that of the total number of jurors on the panel, 36% were excused for cause. Of the jurors excused for cause, approxi-

mately 80% were excused based solely upon their answers to the questionnaire. Fourteen jurors were ultimately chosen to serve on the jury or as alternates. On the questionnaires of the 14 people chosen as jurors or alternates, one responded to the questionnaire that she followed the story in the media with interest and one stated he could not put aside prior knowledge of the case and reach a decision based upon the evidence. Jackson claims two of the jurors ultimately chosen responded to the questionnaire that they could not put aside prior knowledge. Jackson fails to provide the court with references to the record for this assertion. The record reflects there was only one juror in this category. All the jurors were rigorously questioned during voir dire and stated they could listen to the evidence at trial and reach a verdict with impartiality. After the final panel was selected, the defendant had an opportunity to renew his motion for change of venue, but chose not to do so and passed the panel for cause. This indicates during voir dire there were few problems with obtaining and empaneling an impartial jury. See generally *State v. Bierman*, 248 Kan. 80, 88, 805 P.2d 25 (1991); *State v. Richard*, 235 Kan. 355, 365, 681 P.2d 612 (1984).

Although Jackson has established that there was wide media publicity regarding the shooting, this court has long held that media publicity alone never establishes prejudice per se. See *State v. Grissom*, 251 Kan. at 927. The burden is on the defendant to show that the publicity has reached the community to such a degree that it is impossible to get an impartial jury. 251 Kan. at 927. In *Grissom*, the court affirmed the trial court's denial of a change of venue motion where over 120 articles were published in the local media, one Kansas City television station alone broadcast about 200 stories, and voir dire took 4 days. 251 Kan. at 928.

Jackson claims that the news coverage here was more inflammatory than in *Grissom*. He notes that one news program showed an interview with a sister of a murder victim, other citizens voiced outrage at the incident, and one news segment reported an effort to seek contributions to establish an organization dedicated to ensuring public safety from other similar incidents. Jackson also points to another story which concerned the district attorney's comments regarding the limited retroactivity provision of the Kan-

sas Sentencing Guidelines which had led to Jackson's release from a prior incarceration shortly before the shootings. On this basis, Jackson speculates that this coverage deprived him of a fair trial. Our review of the stories indicates that they were factual and not so inflammatory as to interfere with Jackson's right to a fair trial.

Jackson also argues that media coverage was inaccurate. He cites to one inaccuracy—that 27 members of the jury panel incorrectly recalled that Jackson had been kicked out of the club and later returned with a gun. The evidence at trial was uncontroverted that Jackson did not leave the club, but merely exited through the first set of exit doors and returned shortly thereafter. Jackson has not shown how this inaccurate belief held by some jurors prior to hearing evidence denied him a fair trial.

Many of the venirepersons qualified to sit as jurors had been exposed to some pretrial publicity. However, each juror was questioned extensively about whether he or she had formed an opinion about the case. Each one stated unequivocally that he or she had not formed an opinion or would be able to set aside that opinion and would presume the defendant innocent and decide the case based solely upon the evidence and the law. The record reflects that the jurors who indicated on the questionnaires that pretrial publicity might create a preconceived version of the facts were subject to intense voir dire.

The jurors asserted they could be fair and impartial and would decide the case based on the evidence. Nothing in the record suggests that the jurors were untruthful about their ability to set aside any preconceived opinions and decide the case based solely on the evidence. That the jurors made distinctions in Jackson's culpability relating to the three murders indicates that their verdicts were not the result of a panel inflamed by prejudice.

In *State v. Ruebke*, 240 Kan. at 500-01, the court stated:

"Media publicity alone has never established prejudice per se. The trial court had no difficulty in finding from the jury panel jurors who stated that they could render a fair and impartial verdict. . . . Unless we are to assume that (1) the jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual can commit a crime so

heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not established substantial prejudice."

In reviewing the record, we find that Jackson offers only speculation that his substantial rights were prejudiced. The trial court did not abuse its discretion in denying Jackson's motion for change of venue.

## V. UPWARD DURATIONAL DEPARTURE

Pursuant to K.S.A. 1993 Supp. 21-4716(a), the district court must find "substantial and compelling reasons to impose a departure" of a sentence. K.S.A. 1993 Supp. 21-4716(a) also requires the district court to "state on the record at the time of sentencing the substantial and compelling reasons for the departure." Jackson argues the district court erred in imposing an upward durational departure sentence on his conviction for voluntary manslaughter. Jackson claims the court never articulated how Jackson manifested excessive brutality in a manner not normally present in the voluntary manslaughter of Stratton or the substantial and compelling reasons for the upward durational departure.

A claim that the departure factors relied upon by the sentencing court do not constitute substantial and compelling reasons for departure is a question of law for which an appellate court's review is unlimited. *State v. Cox*, 258 Kan. 557, 575, 908 P.2d 603 (1995); *State v. Gideon*, 257 Kan. 591, Syl. ¶ 20, 894 P.2d 850 (1995). A clearly erroneous standard applies to a claim that the evidence was insufficient to justify a departure. *State v. Gideon*, 257 Kan. 591, Syl. ¶ 20.

In its request for an upward departure, the prosecution stated as reasons for departure sentencing:

"2. The defendant's conduct during the commission of the current offense manifested excessive brutality to the victim in a manner not normally present as suggested by K.S.A. 21-4716(b)(2)(B).

"3. The defendant repeatedly used firearms in the commission of the current offense.

"4. The defendant was on supervised release from incarceration for a conviction of a felony at the time of the commission of the current offense."

In the journal entry, the judge listed only one aggravating factor for the departure sentence, that "[t]he defendant's conduct during the commission of the current offense manifested excessive brutality to the victim in a manner not normally present in that offense." This is a factor listed in K.S.A. 1993 Supp. 21-4716(b)(2)(B).

The district court's reasons for departure at sentencing differ somewhat from its written findings. Comments at the time of sentencing, not the written journal entry, govern as to reasons for departure. *Gideon*, 257 Kan. 591, Syl. ¶ 21. The district court stated in imposing sentence:

"All right. It's always a question as to how much the Court should say. The law requires me to say certain things. A case like this, there's a lot that can be said about it. Mr. Meineke has alluded to Mr. Jackson's criminal record, which formally began at age 13. The conviction in the 1987 juvenile case that's been referred to, Mr. Jackson struck a school teacher in the face, fractured bones, ran up a $9500 medical bill which he was ordered to pay and he's never paid a nickel. He's been involved in the social systems of this community since, if in fact not before, age 13. He's been through substance abuse treatment, medical—or alcohol and drug treatment. No significant record of any employment. It's a bit eerie the factual patterns between what happened at age 17 at Topeka High School and what occurred at Shanghi-Lil's in April 1994, because it was about the same thing. The teacher had asked Mr. Jackson to leave the gym. He was there without a pass. And instead of leaving, he went off. When he went off at Shanghi-Lil's, he had a gun, and as a result of that, three people are dead.

"I think the real issue today in the whole discussion, really, is centered around two issues, as I see them, on this sentence. One is, do we do a departure as to the voluntary manslaughter count involving Mr. Stratton and do we run all of the sentences consecutively or concurrently? Let me first say that while it may be an exercise in the absurd, there are lots of reasons for sentencing. Some of them—some of them directly [affect] the victim or have directly to do with the victim.

"There have been attempts at rehabilitation, probably to the excess, with Mr. Jackson, and as far as the Court's concerned, it's time we threw away the key. So, as to the defendant, I see nothing that would say anything other than crying out for the Court to make sure that Mr. Jackson doesn't have another opportunity to confront a teacher or to be confronted by a teacher or someone asking him at two o'clock in the morning or telling him that it's time to leave a bar.

"Sentencing also says something to the community, and that is, how do we value human life and how do we deal with people? Some of the family members mentioned life without parole. We don't have that sentence in Kansas. Maybe we should. I don't know. It's not my decision to make. But we don't have life without

parole in Kansas. We have a rather—if you haven't gathered already, it's a rather complicated system that we have to work with. But it seems to me that to give concurrent sentences in this case would depreciate the lives of the victims who also died and the tragedy that it's caused the families when a person on parole in violation of not only his parole, but the law, took a firearm into a public place and started firing. That is a reckless disregard of human life and affected multiple people. And as to Mr. Stratton, he gunned him down while he was running away. He was under no threat at all. So I see no reason to—I mean, I believe it is my obligation to make a departure in the Stratton case, which would be Count 3, and as to that which, as I say, that's really what we're talking about, and also the concurrent and consecutive sentences. And I'm going to sentence Mr. Jackson to 190 months on Count 3."

Jackson does not discuss the issues addressed by the trial court in imposing sentence. Citing *State v. Cook*, 259 Kan. 370, 913 P.2d 97 (1996), Jackson argues only that the general rule in Kansas is that a shooting does not qualify as a factor of excessive brutality in an aggravated battery. *Cook* involved a determination of whether there was evidence indicating that the killing was done in a heinous, atrocious, or cruel manner, so as to support the imposition of a hard 40 sentence and not whether a shooting is excessively brutal. Jackson analogizes a finding of excessive brutality in committing a murder by shooting to a finding of committing murder in a particularly "heinous, atrocious, or cruel manner" under the hard 40 statute, K.S.A. 1993 Supp. 21-4628. Using this rationale, he contends that there is no evidence to support a finding that Stratton suffered serious mental anguish or serious physical abuse above and beyond a typical murder committed by shooting.

The State contends that the defendant's analogy between an excessively brutal aggravated battery and a heinous, atrocious, or cruel murder is not appropriate. The State asserts that if the legislature had intended to incorporate the case law defining the terms "heinous, atrocious, or cruel" into the "excessive brutality" aggravating factor for upward durational departure sentences, the legislature would have used the terms "heinous, atrocious, or cruel" rather than "excessive brutality" in listing the aggravating factor.

A "heinous, atrocious, or cruel" murder allows a defendant to be imprisoned for 40 years without parole, the harshest sentence in Kansas at the time it was enacted. K.S.A. 1993 Supp. 21-

4716(b)(2)(B). A finding of "excessive brutality" allows a court to depart from the defendant's presumptive guidelines sentence by up to two times the maximum presumptive imprisonment term. K.S.A. 1993 Supp. 21-4719(b)(2). We agree with the State's contention that these terms are not related. See *State v. Valentine*, 260 Kan. 431, 921 P.2d 770 (1996).

In imposing the departure sentence, the trial judge noted that after Jackson shot Fabry, an unarmed Stratton came to Fabry's aid by grabbing Jackson around the arms and chest. After Stratton let go of Jackson and started to run in an effort to escape, Jackson shot Stratton. Under the circumstances, the trial court did not err in finding that Jackson's conduct during the commission of the offense manifested excessive brutality to the victim in a manner not normally present in the offense.

The next question is whether the excessive brutality constituted a substantial and compelling reason for departure. See K.S.A. 1993 Supp. 21-4721(d)(2). In K.S.A. 1993 Supp. 21-4716(b)(2)(B), the legislature made it clear that excessive brutality is an aggravating factor which may be considered in determining whether substantial and compelling reasons exist for departure. Further, we have previously determined that excessive brutality alone may constitute a substantial and compelling reason for departure. See *State v. Valentine*, 260 Kan. at 444 (citing *State v. Duke*, 256 Kan. 703, 721, 887 P.2d 110 [1994]). We find the court's findings constitute a substantial and compelling reason for departure. The trial court's imposition of an upward durational departure sentence is affirmed.

## VI. AGGRAVATED BATTERY SENTENCE

K.S.A. 1993 Supp. 21-3414(a)(1)(A), intentionally causing great bodily harm to another person or disfigurement of another person, is a level 4 felony offense, and the district court sentenced Jackson to 43 months on count 4 for a level 4 felony offense. The 43-month figure is the highest figure in box 4-I of the nondrug sentencing grid. K.S.A. 1993 Supp. 21-4704.

Jackson argues that the district court erred in sentencing him for a level 4 aggravated battery of Alan Eastman, and that the

sentence is illegal. The State conceded this issue during oral argument.

K.S.A. 1993 Supp. 21-3414 provides:

"(a) Aggravated battery is:

(1)(A) intentionally causing great bodily harm to another person or disfigurement of another person; or

(B) intentionally causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, or death can be inflicted; or

(C) intentionally causing physical contact with another person when done in a rude, insulting, or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, or death can be inflicted; or

(2)(A) recklessly causing great bodily harm to another person or disfigurement of another person; or

(B) recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, or death can be inflicted.

"(b) Aggravated battery as described in subsection (a)(1)(A) is a severity level 4, person felony. Aggravated battery as described in subsections (a)(1)(B) and (a)(1)(C) is a severity level 7, person felony. Aggravated battery as described in subsection (a)(2)(A) is a severity level 5, person felony. Aggravated battery as described in section (a)(2)(B) is a severity level 8, person felony. A person convicted of aggravated battery shall be subject to the provisions of subsection (h) of K.S.A. 1993 Supp. 21-4704 and amendments thereto."

Count 4 of the complaint, charging aggravated battery, reads:

"On or about the 8th day of April, 1994 in the County of Shawnee and State of Kansas, ROBERT LEWIS JACKSON, did then and there unlawfully, feloniously and wilfully intentionally cause great bodily harm to another person, to-wit: Allan [sic] Eastman, with a deadly weapon, to-wit: 9mm semi-automatic pistol, or in a manner whereby great bodily harm, disfigurement or death could have been inflicted, contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Kansas."

The language of Count 4 is a hybrid of the various sections of K.S.A. 1993 Supp. 21-3414, the aggravated battery statute. Count 4 includes an allegation of "causing" great bodily harm, from section (a)(1)(A), and the allegation of use of a deadly weapon "whereby great bodily harm, disfigurement or death could have been inflicted" from section (a)(1)(B).

The jury was instructed in instruction No. 16 as to count 4 as follows:

"The defendant is charged in Count 4 with the crime of aggravated battery against the person of Allan [*sic*] Eastman. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant intentionally caused bodily harm to another person with a deadly weapon and in any manner whereby great bodily harm, disfigurement or death can be inflicted; and

"2. That this act occurred on or about the 8th day of April, 1994, in Shawnee County, Kansas."

This instruction does not state all the elements of level 4 aggravated battery because it lacks the element of "causing great bodily harm" and instead uses the language of K.S.A. 1993 Supp. 21-3414(a)(1)(B), a level 7 felony. Based on the verdict form, the jury actually convicted Jackson of level 7 aggravated battery defined in instruction No. 16. A sentence which does not conform to the statutory provisions, either in character or the term of the punishment authorized, is an illegal sentence. *Carmichael v. State,* 255 Kan. 10, Syl. ¶ 1, 872 P.2d 240 (1994). Therefore, the district court was without jurisdiction to impose a sentence in Count 4 for a level 4 felony offense.

Although the charging document charged a level 4 aggravated battery, Jackson was convicted of level 7 aggravated battery. Under K.S.A. 1993 Supp. 21-3414, severity levels 5, 7, and 8 aggravated battery are lesser included offenses of level 4 aggravated battery. *State v. Ochoa,* 20 Kan. App. 2d 1014, Syl. ¶ 3, 895 P.2d 198 (1995.) Here, the district court had jurisdiction of the level 4 and 7 felonies, and had jurisdiction to impose a sentence for the lesser level 7 aggravated battery of which Jackson was convicted. Jackson's sentence on Count 4 is vacated and the case is remanded with directions to resentence Jackson for a level 7 felony.

## VII. CONSECUTIVE SENTENCE FOR UNLAWFUL POSSESSION OF FIREARM

When imposing Jackson's sentence, the district court stated the following at Jackson's sentencing hearing:

"Count 4, the Court will sentence to 43 months consecutive. Count 5, 9 months consecutive. Count 6, 9 months, and Counts 7 and 8, the Court would sentence the defendant to six months each in the county jail. I will run those two concurrent with the sentence in the burglary case and Counts one through six here."

The district court did not specify whether the sentence in count 6 (unlawful possession of firearm) was to be served consecutive to or concurrent with the other sentences imposed. The subsequent journal entry of sentencing indicates that the sentence in count 6 was to be served consecutive to the sentences imposed in Counts 1-5.

Jackson argues that K.S.A. 1993 Supp. 21-4608(a) requires that his sentence for Count 6 be served concurrent with the other convictions. The State conceded this issue in oral argument.

K.S.A. 1993 Supp. 21-4608(a) provides:

"(a) When separate sentences of imprisonment for different crimes are imposed on a defendant on the same date, including sentences for crimes for which suspended sentences, probation or assignment to a community correctional services program have been revoked, such sentences shall run concurrently or consecutively as the court directs. Whenever the record is silent as to the manner in which two or more sentences imposed at the same time shall be served, they shall be served concurrently . . . ."

The fact that the journal entry of sentencing indicates that the sentence in count 6 was imposed consecutively is not the deciding factor. The court's judgment and sentence in a criminal case do not derive their effectiveness from the journal entry. Once a sentence is imposed, the district court is powerless to vacate that sentence and impose a harsher sentence. *State v. Royse*, 252 Kan. 394, Syl. ¶¶ 3, 4, 845 P.2d 44 (1993).

The judgment in a criminal case, whether it imposes a fine, grants probation, suspends the imposition of sentence, or imposes any combination of those alternatives, is effective upon its pronouncement from the bench. *State v. Hunt*, 257 Kan. 388, Syl. ¶ 5, 894 P.2d 178 (1995).

The sentence on count 6 was effective when pronounced. Because the record of the sentencing hearing is silent as to whether the sentence should run concurrently or consecutively, the sentence must be served concurrent with the other sentences.

## VIII. LEVEL 8 AGGRAVATED BATTERY OF HEIDI CHILDERS

For his final point on appeal, Jackson argues the court was without jurisdiction to convict and sentence him for the aggravated battery of Heidi Childers. The State failed to brief this issue.

In count 5 of the complaint, Jackson was charged with aggravated battery against Childers. Count 5 stated:

"On or about the 8th day of April, 1993, in the County of Shawnee and State of Kansas, ROBERT LEWIS JACKSON, did then and there unlawfully, feloniously and wilfully intentionally cause physical contact with another person, to-wit: Heidi Childers, in a rude, insulting or angry manner with a deadly weapon, to-wit: 9mm semi-automatic pistol, or in a manner whereby great bodily harm, disfigurement or death could have been inflicted, contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Kansas."

K.S.A. 1993 Supp. 21-3414, which defines aggravated battery, provides:

"(a) Aggravated battery is:

(1)(A) intentionally causing great bodily harm to another person or disfigurement of another person; or

(B) intentionally causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, or death can be inflicted; or

(C) intentionally causing physical contact with another person when done in a rude, insulting, or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, or death can be inflicted; or

(2)(A) recklessly causing great bodily harm to another person or disfigurement of another person; or

(B) recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, or death can be inflicted.

"(b) Aggravated battery as described in subsection (a)(1)(A) is a severity level 4, person felony. Aggravated battery as described in subsections (a)(1)(B) and (a)(1)(C) is a severity level 7, person felony. Aggravated battery as described in subsection (a)(2)(A) is a severity level 5, person felony. Aggravated battery as described in section (a)(2)(B) is a severity level 8, person felony. A person convicted of aggravated battery shall be subject to the provisions of subsection (h) of K.S.A. 1993 Supp. 21-4704 and amendments thereto."

Count 5 charged aggravated battery found in K.S.A. 1993 Supp. 21-3414(a)(1)(C), a level 7 felony. The jury was instructed on the offense in instruction No. 18. The jury was also instructed in instruction No. 19 on the form of aggravated battery found in K.S.A. 1993 Supp. 21-3414(a)(2)(B), a level 8 felony which the trial court found to be a lesser included offense. Jackson made no objection to the instruction. The jury ultimately convicted Jackson of the lesser included offense. Jackson now claims that the court was with-

out jurisdiction to adjudge him guilty of the level 8 aggravated battery because it was not a lesser included offense of level 7 aggravated battery.

K.S.A. 21-3107(2) provides:

"Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

(a) A lesser degree of the same crime;

(b) an attempt to commit the crime charged;

(c) an attempt to commit a lesser degree of the crime charged; or

(d) a crime necessarily proved if the crime charged were proved."

Count 5 charged Level 7 aggravated battery or intentionally causing physical contact done in a rude, insulting, or angry manner with a deadly weapon or in any manner whereby great bodily harm, disfigurement, or death can be inflicted. K.S.A. 1993 Supp. 21-3414(a)(1)(C). Level 8 aggravated battery is recklessly causing bodily harm with a deadly weapon or in any manner whereby great bodily harm, disfigurement, or death can be inflicted. K.S.A. 1993 Supp. 21-3414(a)(2)(B).

The two levels of aggravated battery differ in two respects, the intent and the type of harm caused: Level 7 contemplates intentional conduct while level 8 contemplates reckless conduct. With respect to the differences in intent requirement, Jackson concedes that intentional conduct includes reckless conduct. Jackson argues, however, that Level 7 aggravated battery requires physical contact done in a rude, insulting, or angry manner, while level 8 requires bodily harm. Here, Jackson contends that proving the lesser crime does not necessarily prove the greater crime, as one may prove rude, insulting, or angry physical contact without proving, or needing to prove, bodily harm.

In determining whether a lesser crime is a lesser or a lesser included offense under K.S.A. 21-3107(2)(d), a two-step analysis has been adopted. The first step is to determine whether all of the statutory elements of the alleged lesser included crime are among the statutory elements required to prove the crime charged. Under the second prong of the test, even if the statutory elements of the lesser crime are not all included in the statutory elements of the

crime charged, the lesser crime may still be a lesser included crime if the factual allegations of the charging document and the evidence required to be adduced at trial in order to prove the crime charged would also necessarily prove the lesser crime. *State v. Fike,* 243 Kan. 365, Syl. ¶ 1, 757 P.2d 724 (1988).

The flaw in Jackson's reasoning is that the evidence at trial indicated that Childers had suffered bodily harm which was either the result of intentional or reckless conduct. The trial court instructed on the theory of aggravated battery charged in the complaint (intentional physical contact) and the theory of aggravated battery supported by the evidence at trial (reckless bodily harm) which carries a less severe sentence. Jackson made no objection to the instruction at trial. This is not a case where the defendant has been prejudiced by an instruction on a completely different crime with an increased severity level. Under the facts of this case, we affirm Jackson's conviction and sentence on this count.

We vacate Jackson's sentence for aggravated battery of Alan Eastman and remand for resentencing. Jackson's sentence for count 6, unlawful possession of firearm, is ordered to run concurrent with his other sentences. Jackson's convictions and other sentences are affirmed.