No. 83,691

STATE OF KANSAS, *Appellee,* v. DANNY D. SMITH, *Appellant.*

(24 P.3d 727)

Opinion filed June 8, 2001.

*Cheryl A. Pilate,* of Wyrsch Hobbs Mirakian & Lee, P.C., of Kansas City, Missouri, argued the cause, and *Stephen G. Mirakian,* of the same firm, was with her on the briefs for appellant.

*Michael A. Russell,* assistant district attorney, argued the cause, and *Daniel Cahill,* assistant district attorney, *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Defendant Danny Smith appeals his convictions for the second-degree intentional murder of Julie Garrett and attempted second-degree murder of Michael Wilson. See K.S.A. 2000 Supp. 21-3402; K.S.A. 21-3301. Smith contends on appeal that his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 1 and 10 of the Kansas Constitution Bill of Rights were violated.

The specific issues are whether the district court erred by: (1) allowing a witness for the prosecution to testify regarding an alleged agreement between the witness and Smith's former defense attorney to pay the witness to change his testimony and testify that Smith was not the shooter; (2) refusing to instruct the jury regarding unintentional second-degree murder, voluntary manslaughter, and involuntary manslaughter; (3) declaring a mistrial; (4) refusing

to grant a new trial because of the State's alleged failure to disclose material evidence that would have impeached the State's primary witness; (5) ruling that Smith's right to a speedy trial was ~~t violated; and (6) refusing to grant a new trial based on lack of sufficient evidence to support Smith's convictions.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (a conviction resulting in a life sentence receives automatic review by this court).

Finding no reversible error, we affirm.

## FACTS

On the evening of September 16, 1997, Michael Wilson and Julie Garrett stood behind a pickup truck in front of a "drug house" near the corner of 14th Street and Ridge in Kansas City, Kansas. Other people were either on the porch, in the house, or standing behind the pickup truck.

Witnesses saw a van approach the area. Then, Wilson, a neighbor named Beulah Natividad, and another neighbor named Tommie McGaughy heard gunshots. Wilson testified that the gunfire came from the van. Wilson saw the driver point the gun through the open sliding door of the van. Wilson saw no one else in the van. He heard two shots, ducked down, and heard three or four more shots. He heard Garrett say, "I'm hit." As Wilson walked toward Garrett, he saw the van turn right and then head south down 14th Street. Wilson identified Danny "Dino" Smith, the defendant, as the shooter.

Natividad's house was "caty-corner" to the drug house. She was standing at her front door, with her back to the street, when she heard the shots. She turned around and saw a maroon van, but she could not see anyone in the van. Natividad heard about seven shots, but she could not tell where they were coming from. After the first three shots, she heard a "blood curdling scream" and a female scream "Dino" or "Tino." After hearing more shots, Natividad said people were hollering, "[G]et out of here" and "[G]et the van." She saw the van drive away. (The van did not speed away.) Natividad testified that she had the impression the shots came from inside the pickup truck. After the shots, Natividad saw a man walk

from the truck, enter the house, and then leave carrying a brown paper bag.

Tommy McGaughy testified that he was sleeping on the porch of a neighboring house when he heard a succession of two or three gunshots and then four or five more. He looked toward Ridge Street and saw a red minivan. McGaughy saw one person in the van, who could have been black or Hispanic. He said the driver raised his arm towards the passenger window and shot at Mc-Gaughy. McGaughy ran into the house. When he returned outside, he saw a woman lying face down in the street. When the police arrived, they found Garrett lying in the street. She died from a gunshot wound to the chest.

The State charged Smith with the second-degree murder of Garrett. He made his first appearance and was released on bond. The State filed an amended information charging Smith with the first-degree murder of Garrett and the attempted first-degree murder of Wilson. Smith was then detained in the Wyandotte County jail.

Wilson made a deal with the State to testify against Smith. However, at the preliminary hearing, Wilson changed his testimony and said the shooter was *not* Smith. He acknowledged that he had previously picked out Smith as "Dino" from a video or photographic line-up shortly after the shooting. Smith was bound over for trial.

After the preliminary hearing, Wilson was arrested in two separate cocaine cases. He sent a note to his attorney and to the prosecutor saying he wanted to cooperate. Wilson said he "had lied" and that he "wanted to make it right." He agreed to wear a "wire" and talked to Smith in the county jail. The district court excluded the recorded conversation.

After the jury was selected, the district court was informed that Wilson would testify that he failed to identify Smith at the preliminary hearing because Smith's counsel had offered to pay him to change his testimony. The district court heard Wilson's testimony outside the presence of the jury. Wilson said that he had reached an agreement with defense counsel. He was to be paid to alter his testimony. Wilson's brother allegedly picked up at least part of the money from the defense counsel's office after the preliminary hear-

ing. Based on Wilson's testimony about the payoff, the district court found that it had no choice but to declare a mistrial.

Smith later obtained new counsel, and the trial resulting in his convictions was held in May 1999. Smith filed a denial of a speedy trial motion and a motion in limine to exclude his former defense counsel's alleged statements to Wilson. The district court denied both motions. Smith's former counsel invoked the Fifth Amendment and did not testify.

At trial, Wilson returned to his first version of the shooting, identifying Smith as the shooter. Wilson explained that at the preliminary hearing, he had falsely denied Smith was the shooter because he had been paid by Smith's former defense attorney to change his testimony. Wilson also informed the jury of his initial deal with the State in exchange for his testimony identifying Smith as the shooter. He denied any further deals with the State.

Smith was sentenced to a life term for second-degree murder and 340 months for attempted second-degree murder, to be served consecutively.

## DISCUSSION

Smith's first claim of error focuses on an abuse of discretion in denying his motion in limine and admitting a portion of Wilson's testimony. Smith argues that: (1) the admission of the alleged out-of-court statements of Smith's former counsel were hearsay, and (2) presentation of the statement through Wilson violated Smith's right to confrontation under the Sixth Amendment.

We review both a district court's decision regarding a motion in limine and the admission or exclusion of hearsay evidence under an abuse of discretion standard. *State v. Humphrey*, 267 Kan. 45, 55, 978 P.2d 264 (1999).

The district court was notified before trial that Smith's former defense counsel would assert her Fifth Amendment right against self-incrimination and, therefore, was an unavailable witness. Wilson was allowed to testify, over a hearsay objection, regarding the former defense counsel's approach to him. The district court reasoned that Wilson's statements regarding what happened between Smith's former counsel and Wilson were declarations against in-

terest, "a clear exception to the hearsay rule." See K.S.A. 2000 Supp. 60-460(j).

Wilson testified as follows. Smith's former defense counsel contacted him the weekend before the preliminary hearing. She asked Wilson to meet her at her office. Wilson and a friend, "Millie," drove to the office. (Wilson did not know where to find Millie at the time of trial.) Wilson went into the defense counsel's office alone. Counsel wrote on a tablet that Smith was willing to take care of Wilson if Wilson would change his statement. Counsel said Smith was willing to pay $5,000. Wilson said he wanted $10,000. They agreed that Wilson would receive $7,500 if Smith was not bound over for trial, or Wilson would receive $5,000 if Smith was bound over. Wilson received $2,500 through his brother Freddie. (Freddie did not testify at trial, but in a statement made in November 1998, he denied having anything to do with picking up money from Smith's attorney.)

Smith argues that not only were the statements hearsay, but also the district court's ruling prevented him from fully cross-examining the former defense counsel. Thus, Smith claims he was prevented from presenting a complete defense, which violated his right to confront the witnesses against him under the Sixth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. He also claims a denial of a fair trial under the Fourteenth Amendment to the United States Constitution.

Smith points out that the district court must consider the reliability or truthfulness of the statement before allowing its admission under K.S.A. 2000 Supp. 60-460(j). See *State v. Johnson*, 240 Kan. 326, 330, 729 P.2d 1169 (1986), *cert. denied* 481 U.S. 1071 (1987). He contends that the district court erred by failing to make a specific finding of truthfulness. However, it is well-established that " '[r]eliability can be inferred where the evidence falls within a firmly rooted hearsay exception. If the evidence does not fall within a firmly rooted hearsay exception, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness. [Citation omitted.]' " *Humphrey*, 267 Kan. at 55-56. The State relies on *State v. Bird*, 238 Kan. 160, 708 P.2d 946 (1985), where Bird was prosecuted for the solicitation of the murder of his sec-

retary's husband. During trial, the district court allowed a witness to testify concerning statements made to her by Bird's secretary concerning the secretary's "affair" with Bird. The secretary had invoked her right against self-incrimination and refused to testify. The witness testified that the secretary told her tales of her relationship with Bird and requested the witness to "cover" for her with the husband of the witness. We noted in approving the statements' admission that the secretary's statements were not a confession; rather, they showed motive and did not directly implicate Bird in the crime charged. 238 Kan. at 174. The State contends that the statements here, like the situation in *Bird,* were not a coconspirator's confession and, thus, were not inherently unreliable. Here, however, the district court did not make a specific finding regarding the reliability of the proffered statements. The State argues, in the alternative, that Smith's former counsel's statements were admissible as adoptive admissions or vicarious admissions. See K.S.A. 2000 Supp. 60-460(h) and (i). The district court rejected this argument, finding no evidence was presented that Smith authorized the alleged bribe.

We find no reversible error in admitting Wilson's testimony. In our view, the testimony was not hearsay. We begin our analysis by examining the record of the chambers conference on the motion in limine. The district court was confronted with a remarkable turn of events. The State had subpoenaed Smith's former attorney who had indicated that she would invoke her Fifth Amendment rights. What was the State's purpose in pursuing the change in Wilson's testimony? The prosecutor said:

"MR. CAHILL: Well, Judge, what I'm offering these statements for and all of these including what I want to do over the defendant's statements for is to explain Mr. Wilson's prior testimony. See, here's—here's how I envision it happening. Mr. Wilson will get up on the stand and say, you know, that he was there when the shots happened, who fired the shots that hit Ms. Garrett and then he will name the defendant Danny Smith, that guy right there.

"Imagine that some point in his cross-examination, Mr. Duma's (defense counsel) gonna say, let's look at your preliminary hearing. What did you say at preliminary hearing? Well, I said that that was not him. Okay. You know, at that point, that's almost a sit down and shut up question, great answer, I'll go sit down. *Now I've got to come up here and say, Michael, why did you testify thusly?*

"THE COURT: Um-hum.

"MR. CAHILL: And why did you say that? *So really what I'm offering these statements for is to explain his prior testimony and*—and basically to—to rehabilitate, although it's not even a rehabilitation, *but merely an explanation of his prior testimony."* (Emphasis added.)

Wilson's testimony was not introduced to prove the truth of the matter asserted, but rather to explain Wilson's reason for changing his testimony. The truth of the alleged actions of Smith's former attorney was not the question. The question was the effect of those actions upon Wilson.

Testimony not admitted to prove the truth of the matter asserted by an out of court declarant is not hearsay. The admission of such testimony does not violate the Confrontation Clause. *State v. Ninci,* 262 Kan. 21, 52, 936 P.2d 1364 (1997).

In *State v. Getz,* 250 Kan. 560, 830 P.2d 5 (1992), Vicky Getz was convicted of felony theft of two horses valued at over $500. Getz unsuccessfully defended on the basis that she was selling the horses for Perry Patton, who had been living with Getz for about a month. Patton disappeared before trial. Getz sought permission to testify that Patton told her he had purchased the two horses and had asked her to help in selling them. Getz claimed that the testimony would not be hearsay because it was not being offered to prove whether Patton had purchased the horses, it was being offered to show Getz' state of mind. The district court excluded the evidence and a proffer was made at trial. We agreed with the Court of Appeals that the district court had erroneously excluded the proffered testimony. Getz' testimony was not offered to prove the truth of the matter, *i.e.,* whether or not Patton had bought the horses. The evidence was of a verbal act that Patton had stated that he had purchased the horses. Patton's statement was relevant to the question of Getz' intent. All relevant evidence is admissible. K.S.A. 60-407(f). We held in *Getz* that the error in excluding the evidence was not harmless because if it had been admitted the jury could have reached a different result. 250 Kan. at 570.

In *State v. McClain,* 220 Kan. 80, 81, 551 P.2d 806 (1976), we held that a police officer, Davis, was properly permitted to testify over the objection of defendant McClain that another police offi-

cer, Meyer, had advised McClain of his rights by reading the *Miranda* warning "as printed on our blue card." Davis testified fully as to the rights covered in the warning and that McClain had said to Davis and Meyer that he understood those rights. McClain objected to Davis' testimony concerning the advice of rights because it was hearsay. We observed that hearsay is defined in 60-460 as an out of court statement offered to prove the truth of the matter asserted and stated:

"2 Wharton's Criminal Evidence (13th Ed.) § 274, states the rule as follows:
'An extrajudicial statement is inadmissible as hearsay only when offered as evidence of the truth of the matter to which it relates. If the statement is offered merely to show the fact of its having been made, it is admissible through the person who heard it. . . . '
"6 Wigmore on Evidence (3d Ed.) § 1766, states:
'. . . The essence of the Hearsay rule is the distinction
between the testimonial (or assertive) use of human utterances and their nontestimonial use.

'The theory of the Hearsay rule . . . is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but without reference to the truth of the matter asserted, the Hearsay rule does not apply. . . . '

"And, see, 2 Jones on Evidence (6th Ed.) § 8.6 which gives the following explanation:

'If a statement previously made out of court is offered in evidence through a witness . . . not for the purpose of establishing the truth of the matter stated, but merely for the purpose of establishing the fact that the statement was made, the evidence is admissible, if it is relevant, and it is not subject to the exclusionary impact of the hearsay rule.'

'One prominent class of such statements [is] often referred to as verbal acts . . . . '

"In *State v. Rhoten*, 174 Kan. 394, 400, 157 P.2d 141, we held that the testimony of an officer that he heard statements such as 'Place your bets' and 'New man shooting' emanating from a building in which it was alleged that a dice game was in progress was not hearsay but was original evidence, under the rule set forth in § 1766 of Wigmore, supra.

"Clearly the state was not attempting to prove the truth of the matter stated, viz., the *Miranda* warnings. The evidence was offered for the purpose of establishing that the warnings were stated and explained to the defendant prior to the

interview. The witness heard the warnings read and he may say so." 220 Kan. at 81-82.

In *State v. Belt,* 6 Kan. App. 2d 585, 591, 631 P.2d 674, *rev. denied* 230 Kan. 819 (1981), the Court of Appeals reversed an arson conviction based on error in excluding out of court statements as hearsay. The district court did not admit conversations that two defense witnesses had with an unknown white male the night of the fire in the building where the fire occurred. Apparently, the unknown declarant had approached the witnesses and said either "Are you going to stay around and watch the fire department?" or "Are you going to stay around and watch the fire?" 6 Kan. App. 2d at 588. Both witnesses, in their offer of proof, testified that the statement was made by a dark-complected man dressed in a green army fatigue jacket and blue stocking cap, who was acting weird, like a "wild man." Both testified in the proffer that the declarant was not Belt. The *Belt* court concluded: "The declarant's statement was offered only to prove that the statement was made. It was not offered to prove that the declarant was waiting around in the bar because he knew a fire would start in the building in a few hours." 6 Kan. App. 2d at 589; see *State v. Hernandez,* 170 Ariz. 301, 306, 823 P.2d 1309 (1991). In *Hernandez,* a witness testified that he had heard an unknown person say that unnamed "others" were going to beat up the victim. The testimony was objected to as hearsay. The offered testimony was not hearsay. The extrajudicial utterance was not offered as proof of the matter asserted. The court noted that words offered to prove the effect on the listener are admissible when they are offered to show their effect on those whose conduct is at issue. The court held that the truth of the statements was not the question; it was their effect upon the listener. We agree with the reasoning in *Hernandez.*

The preferred procedure for the district court when admitting an out of court statement that is not being offered to prove the truth of the matter asserted is to inform the jury of the limited purpose for admission. Here, the district court did not do so. Wilson's testimony came in under K.S.A. 2000 Supp. 60-460(j) as a hearsay exception. However, the district court was right but for the

wrong reason. See *State v. Wilburn,* 249 Kan. 678, 686, 822 P.2d 609 (1991).

The admission of Wilson's testimony was not reversible error.

## Failure to Disclose Exculpatory Evidence

According to Smith, the State failed to disclose evidence that it had made a deal with Wilson to dismiss one of his cocaine charges and to recommend probation on the other charge in exchange for Wilson's testimony against Smith.

Prosecutors are under a positive duty, independent of either a defendant's request or court order, to disclose exculpatory evidence. *State v. Wilkins,* 269 Kan. 39, 42, 5 P.3d 520 (2000). Smith filed pretrial motions in which he requested all exculpatory information. Exculpatory evidence "'tends to disprove a fact in issue which is material to guilt or punishment' of a defendant." *State v. Nuessen,* 23 Kan. App. 2d 456, 461, 933 P.2d 155 (1997) (quoting *State v. Carmichael,* 240 Kan. 149, 153, 727 P.2d 918 [1986]). Exculpatory evidence may include evidence bearing on the credibility of a key witness. 23 Kan. App. 2d at 461. Smith correctly points out that evidence of an agreement with the State to dismiss a charge against a prosecution witness and to recommend probation in exchange for the witness' testimony would be the type of evidence that must be disclosed to a defendant. See *Wilkins,* 269 Kan. at 42.

If there was a second deal between Wilson and the State, there is no question but that the evidence would be exculpatory. It bore on the credibility of Wilson, the key witness. It was also material. However, Smith fails to show that Wilson made a second deal with the State before he testified against Smith at the trial. In his trial testimony, Wilson denied that he had been offered a deal on his two new cocaine charges, and he said he did not expect to get a deal after Smith's trial was over. Under vigorous cross-examination concerning his initial grant of immunity and agreement to cooperate, he acknowledged the possibility of favorable consideration in his pending cases, but when he was asked, "Have you been offered any new deal whatsoever?," on redirect, Wilson replied, "No." During a bench conference, the prosecutor told the court,

"There has been no deal [after the preliminary hearing testimony] and there will not be any deal." The prosecutor informed the jury that Wilson was testifying for the State as a condition of the original agreement with the State made *before* the preliminary hearing. The jury was instructed:

"In evaluating the testimony of Michael Wilson, you may consider the fact that he received a benefit from the State for his testimony. You should consider the testimony with caution unless it is supported by other evidence."

Two months after Smith's trial, Wilson pled guilty to one cocaine charge and a misdemeanor charge of possession of drug paraphernalia under a plea agreement (a second cocaine charge was dismissed, and the State agreed to recommend probation). On August 11, 1999, after Smith was tried and sentenced, Wilson appeared for sentencing. As recommended by the State, the district court ordered probation, which the judge characterized as "one very large break." The State said it recommended probation because Wilson had been a "key witness" in a murder trial and had "cooperate[d] fully" with the State.

We conclude that the record does not support a new deal with Wilson arising from his cocaine charges in exchange for his testimony. The State suggests that if there was any new agreement, it must have been struck with Wilson *after* Smith's trial. It appears that Wilson came forward on his own and testified in hopes of obtaining leniency in the future. However, there is no evidence that he reached a new agreement with the State to recommend leniency before trial. There was no new deal to disclose and, thus, no error.

## Lesser Included Offense Instructions

Next, Smith argues that the district court erred by refusing to instruct the jury on unintentional second-degree murder, voluntary manslaughter, and involuntary manslaughter as lesser included offenses of intentional second-degree murder. Smith's contention lacks merit.

Because Smith requested these instructions, we are required to view the evidence in the light most favorable to him. He was en-

titled to an instruction on the law applicable to his theories for which there was supporting evidence. See *State v. Sims*, 265 Kan. 166, 168, 960 P.2d 1271 (1998). The district court found that the evidence did not support these instructions. We agree. There is "[n]o duty to instruct the jury on a lesser included offense . . . where the evidence as a whole, viewed in the light most favorable to the defendant, could not reasonably support a jury verdict on the lesser included offense." *State v. Simkins*, 269 Kan. 84, 90, 3 P.3d 1274 (2000).

Unintentional second-degree murder, or "depraved-heart" murder, K.S.A. 2000 Supp. 21-3402(b), requires "the killing of a human being committed: . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." See *State v. Robinson*, 261 Kan. 865, Syl. ¶ 5, 934 P.2d 38 (1997). Involuntary manslaughter is the unintentional killing of a human being committed "recklessly." K.S.A. 2000 Supp. 21-3404(a).

Smith argues that McGaughy's testimony showed that the shooter may have: (a) been firing randomly into the neighborhood, rather than specifically at Garrett, or (b) been merely shooting recklessly at random, justifying either an unintentional second-degree murder instruction or an involuntary manslaughter instruction.

The State counters with *State v. Jackson*, 262 Kan. 119, 936 P.2d 761 (1997). Jackson was convicted of two counts of first-degree murder and other charges. He shot and killed two people in a nightclub. On appeal, he argued that the district court erred in failing to instruct the jury regarding involuntary manslaughter. Jackson relied on the testimony of a witness who testified that the second victim was shot as he ran by Jackson after Jackson had shot the first victim. Jackson argued that the second victim may have been killed by a random shot. We rejected this argument, noting that the witness never testified that Jackson shot randomly. Moreover, the witness testified that he could not tell where or at what Jackson was shooting. 262 Kan. at 125.

McGaughy did not testify that the shooter fired randomly. He testified that shots were fired at him. The facts here are similar to

those in *Jackson*. The district court did not err in refusing to give an instruction on unintentional second-degree murder or involuntary manslaughter.

Smith also argues that the district court should have given an instruction on voluntary manslaughter under the theory of a sudden quarrel. Smith bases this upon the fact that Wilson testified that 2½ or 3 months before the shooting, he and Smith had a dispute over a drug deal. Wilson said Smith tried to cheat him by giving him less crack cocaine than he had bargained and paid for. Wilson said he drew out his pistol and took from Smith the full quantity of drugs and the money Wilson had given him. Wilson testified that right after the incident, Smith called him. Their conversation was "not friendly." Smith said he was "gonna burn the house down." Wilson offered to return Smith's drugs. Although Wilson saw him at different places, he had no more contact with Smith until the shooting.

We have said: "An intentional killing is not done in the heat of passion if sufficient time has elapsed between the provocation and the killing for an ordinary person to regain reason." *State v. Follin*, 263 Kan. 28, Syl. ¶ 3, 947 P.2d 8 (1997) (finding no error in failing to give a voluntary manslaughter instruction where about 10 hours had passed between the alleged provocation and the killings). The district court did not err in refusing to give a voluntary manslaughter instruction.

### The Mistrial

After the district court was made aware of the allegations that Smith's counsel was allegedly involved in a payoff with Wilson, a mistrial was declared. Smith contends that the declaration of a mistrial violated the prohibition against double jeopardy under the Fifth and Fourteenth Amendments to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. We disagree. Terminating a trial and declaring a mistrial are largely within the discretion of the district court. A clear showing of abuse of discretion must be made before the mistrial decision will be set aside on appeal. *State v. Williams*, 268 Kan. 1, 8, 988 P.2d 722 (1999).

On November 2, 1998, Smith's case was set for trial. The parties appeared, and the defense filed a motion in limine that mentioned allegations that "someone" was involved in a payoff with Wilson. Defense counsel told the court that she learned of the allegations through her own investigation the Saturday before Smith's trial was to begin. The district court found that it had no choice but to declare a mistrial and did so. Defense counsel objected, saying that the court should simply exclude Wilson's testimony about the alleged deal. The district court overruled the objection and told defense counsel that she should remove herself from the case.

Smith argues that the State may have learned of the payoff allegations as much as 2 months before trial, when Wilson contacted police about wanting to recant his testimony from the preliminary hearing. He contends that the declaration of a mistrial was reasonably foreseeable to the State and that the State could have continued the case to allow additional investigation before the jury was sworn.

Smith's new attorney filed a motion to dismiss the second trial, arguing that "various mechanisms existed to prohibit such prejudice [to Smith] before jeopardy actually attached." The district court denied the motion to dismiss and said it had not been adequately informed of the nature of Wilson's testimony before jury selection for the first trial. The trial judge was presented with a novel, sudden, and perplexing turn of events. The district court found it had been necessary to declare a mistrial and that "manifest necessity" was a discretionary decision.

We have recognized the doctrine of manifest necessity. In *State v. Bates*, 226 Kan. 277, 283, 597 P.2d 646 (1979), we said:

"Even when a mistrial is declared without the consent of the defendant or upon his motion, a retrial is still constitutionally permissible if the judge exercised sound discretion in determining justice required a mistrial. [Citation omitted.] The test to be applied in assessing the judge's discretion in declaring a mistrial and discharging the jury from giving a verdict is whether there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. [Citation omitted.]"

Smith correctly points out that "if the prosecutor's misconduct was intentional and substantially prejudiced the defendant's right

to a fair trial, double jeopardy would prohibit a new trial." *State v. McClanahan*, 259 Kan. 86, 101, 910 P.2d 193 (1996). Here, the State acknowledged that Wilson made the allegations "sometime" before trial. The prosecutor said,

"I think when we are dealing with something this serious we have an obligation before we take bare allegations and make them into criminal charges or whatever they are going to become to fully investigate these charges. I don't think that I could in good conscious [*sic*] spread these facts, talk about what Mr. Wilson alleged without doing some investigation, so we are involved in doing that. . . . I was not certain how I was going to handle [Wilson's] testimony at trial when it came up. If I thought that it was going to cause a mistrial, if I thought it was foreseeable that that would happen, chances are and it would have been my fault, I wouldn't have elicited that testimony without at least first bringing it to the Court's attention during that trial . . . ."

The State also argues that asking for a continuance in order to further investigate would have violated Smith's right to a speedy trial. The State was placed in a difficult position since Smith's attorney, the opposing counsel, had allegedly tampered with a witness. When the defense brought to the court's attention a general allegation of witness tampering before trial, the district court decided to first impanel the jury. It does not appear that the State intentionally caused a mistrial. Once it was apparent to the district court that allegations would, in fact, surface concerning defense counsel, a discretionary call based on manifest necessity was made by the district court. There was no abuse of discretion.

## A Speedy Trial

Smith contends that his statutory and constitutional rights to a speedy trial were violated. We disagree. This issue involves a question of law, over which we have unlimited review. See *State v. Hines*, 269 Kan. 698, 698, 7 P.3d 1237 (2000).

The district court declared a mistrial on November 3, 1998. Smith's case appeared on the docket in February 1999, when it was again set for trial. Pretrial issues were addressed on that date, and, with the consent of both counsel, the case was continued until May 3, 1999. Smith acknowledges that because he agreed to the continuance from February 22 to May 3, he cannot complain about

that delay. However, he argues that the delay between November 3 and February 22, totaling 111 days, violated his 22-3402 statutory right to a speedy trial.

The district court reasoned that Smith had caused some of the delay by filing a motion to recuse the judge. It noted that about 74 days passed between the time Smith filed the motion to recuse and the time the motion was ruled upon. The district court found such a time frame "patently unreasonable" and did not tax all of that time to Smith. However, the district court found that a delay of up to 30 days was reasonable when "there is a pending motion to be heard." It concluded that under 22-3402(2), 30 days was a reasonable time to take to process Smith's motions and charged 30 days to Smith. The district court observed that Smith was also being held on a federal charge and, therefore, he was not detained "solely" on the murder charges. Thus, the 180-day period would have applied, rather than the 90-day period under 22-3402.

Smith acknowledges that a federal detainer was filed against him. However, he points out that although his attorney had appeared, he personally had not appeared in federal court on the charge. Smith concludes that he was being held solely on the state murder charges. In *State v. Hill*, 257 Kan. 774, 895 P.2d 1238 (1995), we found that a parole detainer is sufficient to remove a defendant's case from the 90-day period of 22-3402(1). Here, Smith's counsel acknowledged that even if Smith had been released on bond in the state case, "the sheriff would not release him because he would have a hold on him from the detainer on him from the federal case." Thus, substantial competent evidence supports the district court's finding that 22-3402(1) (90-day period) was not applicable. Here, a 30-day delay was attributed to the consideration of Smith's motion to recuse. Smith fails to show that this length of time was unreasonable. See *State v. Southard*, 261 Kan. 744, 748, 933 P.2d 730 (1997) (a 28-day delay was reasonably charged to the defendant based on his filing a motion to suppress).

Smith also argues his right to a speedy trial under the Sixth Amendment to the United States Constitution has been violated. In *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972), more than 5 years passed between Barker's arrest and his

trial. We have adopted the *Barker* four-point analysis and have held that a delay of a little over a year between arrest and trial is not clearly presumptively prejudicial. *Hill,* 257 Kan. at 778-79; *State v. Goss,* 245 Kan. 189, 193, 777 P.2d 781 (1989). Here, less than 4 months elapsed between Smith's mistrial and trial. Thus, the length of delay is not clearly presumptively prejudicial. There is no necessity to inquire into the other factors in the balancing test. Smith's constitutional speedy trial rights were not violated.

## Sufficiency of the Evidence

Last, Smith argues that there was insufficient evidence to support his convictions. We disagree.

Our standard of review is whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced a rational factfinder could have found Smith guilty beyond a reasonable doubt. See *State v. Mason,* 268 Kan. 37, 39, 986 P.2d 387 (1999).

Smith does not attack the evidence supporting his convictions; rather, he attacks Wilson's credibility. He argues that Wilson's testimony "must be discounted not only because he was an admitted liar and perjurer, but also because he received substantial benefits for testifying and those benefits were never fully revealed to the jury." Wilson's alleged deal with the State in exchange for his trial testimony has been discussed in our opinion. The jury was instructed that it should consider Wilson's testimony with caution unless supported by other evidence and that it may consider Wilson's received benefit from the State for his testimony. As for Wilson's credibility, we do not reweigh the evidence or pass on the credibility of witnesses. *State v. Orr,* 262 Kan. 312, 322, 940 P.2d 42 (1997).

Affirmed.