No. 84,843

STATE OF KANSAS, *Appellee*, v. JOHN A. SANDERS, *Appellant*.

(33 P.3d 596)

Opinion filed October 26, 2001.

*Rick Kittel*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*David C. Smith*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, John A. Sanders, from his conviction of first-degree premeditated murder. He was sentenced to life imprisonment with a hard 40 sentence. The victim, Robert Bertsch, was found lying on the side of the road in Kansas City, Missouri. When Bertsch was identified, the police went to his residence in Kansas City, Kansas. No one responded to their knock on the front door, so they went to the rear door where they found what appeared to be a single drop of blood and fresh tire tracks. From the outside of the house, through a small pane glass window near the rear door, the police could observe a small porch area with what appeared to be red blood on the door jam.

Police obtained a search warrant and entered the residence where they found a heavy concentration of blood on a fold-out couch bed in the living room and blood splatters on the walls going up to the ceiling. In the bathroom, police noticed blood, gauze pads, and band-aid wrappers, "consistent with someone having washed and cleaned themselves there in the sink area." While police were at the residence, Kansas State Parole Officer Otis Laskey contacted police and indicated he was looking for Sanders for a probation violation.

On Monday, February 1, 1999, Laskey and Deputy Marshal Matt Cahill drove to Sanders' mother's residence looking for Sanders. As they approached the house, they saw Sanders in the front yard talking to a woman, who was later identified as Sanders' mother. When Sanders saw the officers he ran. After apprehending

Sanders, as the officers were taking him to the car, Sanders' mother said, "Please tell me you didn't do it, please tell me you didn't do it." Although the officers identified themselves as police while taking Sanders into custody, Laskey and Cahill did not inform Sanders of his *Miranda* rights at that time because they "had no intention of asking him any questions." Sanders was, however, made aware that there was a parole warrant for his arrest. On the way to the Wyandotte County Jail, Sanders told the officers that his mother thought "he killed his friend that he lived with . . . [but] that he hadn't."

Later, Detective Terry Mast, of the Kansas City, Kansas, Police Department, picked up Sanders from the Wyandotte County Jail and took him to his office to question him concerning Bertsch's death. At that time, Mast advised Sanders of his *Miranda* rights. During this first interview, after Sanders signed a *Miranda* waiver, two detectives questioned Sanders about Bertsch and his whereabouts on the night of the homicide. When Sanders told them he did not want to talk to them, detectives stopped the interview and took him back to jail. Mast noticed a stain on Sanders' shirt that looked like blood, so he asked jail officials to gather Sanders' clothes for testing. Later, Sanders indicated to Mast that he got blood on his clothes when he moved the body. Bruises on Sanders' hands were also photographed. Sanders then told Mast that he had not been truthful with him and that he wanted to talk to him. Sanders was again transported to the detective bureau where he made a statement before a police typist. After the statement was prepared, Sanders was given the opportunity to read and sign it.

Sanders said that on Thursday, January 28, he and Bertsch went to Wal-Mart, then to the liquor store to purchase some alcohol, and then "went to an address on Riverview where they purchased some rock cocaine." From there, they returned to Bertsch's house where they drank and smoked crack cocaine. Sanders testified that they tried to have sex but were unable to because of the effects of the cocaine. Later, Sanders and Bertsch picked up Dave Edminster at Sanders' uncle's house. The men drove around in Bertsch's car for approximately 45 minutes to an hour, smoked more crack cocaine in the car with Edminster, and then returned to Bertsch's

house after dropping off Edminster. In his statement, Sanders said that sometime between 11:30 p.m. and midnight he took Bertsch's car back to Riverview to purchase another rock of crack cocaine.

Sanders testified that Bertsch had given him a key to the back door earlier and that Bertsch gave him $15 "to get some more dope." Upon returning to Bertsch's house around midnight or a little after, he saw Bertsch lying nude with a large amount of blood on him and a blue robe over him. Sanders stated that he felt for a pulse but could not find any, panicked, and, knowing he was wanted for a parole violation, attempted to "clean up." Sanders wrapped the body in a light blanket, put it in the trunk, and disposed of it in the "west bottoms" of Kansas City, Missouri. Then, after returning to Bertsch's house for approximately 10 minutes, Sanders went to 861 Riverview and stayed there the rest of the night. Sanders told Mast that he loaned Bertsch's car to one of the people who lived at the Riverview address and that they had not brought it back. Sanders testified at trial that he had known Bertsch for about 10 years and had lived with him for approximately 2 weeks prior to January 28, 1999.

At trial, several other witnesses testified concerning the events that occurred during the week preceding Bertsch's homicide. Clifford Brent testified that 1 week prior to Bertsch's homicide, Bertsch had arrived at Trans-Supply late for work. Brent testified that Bertsch said that his car was stolen, and he had to walk to work, but that he planned to wait until lunch to call police. Around 10 or 10:30 a.m., Sanders arrived at Trans-Supply with Bertsch's car keys in his hand. According to Brent, Sanders said that he had found Bertsch's car "over on Parallel," and that Bertsch reacted angrily. After driving off with Sanders and then returning to work 10 minutes later, Bertsch told Brent that he did not call police earlier because he assumed that Sanders had taken his car. Bertsch told Brent that his house had a deadbolt lock and that he always left his keys in the lock overnight in case there was a fire or an emergency. Further, Bertsch said that he had let Sanders spend the night with him and his keys were gone that morning when he got up. Bertsch told Brent that he had taken Sanders to 10th and

Central, put him out of the car, and told him never to come around his place again.

Bertsch's daughter Saraphine testified that her parents were divorced and that she generally spent 4 days a week at Bertsch's house. Saraphine stated that it was Bertsch's habit to keep the house locked, even when they were at home. She also testified that on Friday, January 22, 1999, and on Sunday, January 24, the week before Bertsch's homicide, she and her best friend Amanda Powers spent the night at Bertsch's house. Sanders also spent the night there. Saraphine testified that Bertsch and Sanders had a sexual relationship. At that time, Saraphine and Amanda were both 15 years old and Sanders was 24. Sanders repeatedly told Amanda how beautiful she looked and that he would get the car from Bertsch and pick them up from high school to take them somewhere. Saraphine said that Sanders was having trouble getting the car because Bertsch would not let him take it, because when he let him take it before, "he never brought it back until two weeks, maybe three weeks later."

Amanda testified that Sanders had kissed her at Bertsch's house. Amanda stated that on Monday and Tuesday after school, Sanders called her, appearing aggravated. He told her he still wanted to get the car but did not think he would be able to get it. Amanda testified that in addition to the plan to pick up both girls after school, there was a second plan for Sanders to pick her up on Saturday, January 30, 1999, so the two of them could go out by themselves.

Aaron Barnett testified that on Thursday night, January 28, 1999, he was living with his girlfriend at 861 Riverview when Sanders came there to buy crack cocaine. According to Barnett, Sanders was driving Bertsch's car. Barnett saw Sanders by himself again at the Riverview address after midnight. According to Barnett, Sanders did not have any money to buy crack cocaine when he came back the second time and wanted to know if anyone wanted to buy the car, but no one did.

Later, Sanders drove Barnett, his girlfriend, and her nephew to a store. As they were driving, Sanders showed Barnett some papers in an attempt to show he had title to the car and could sell it. Barnett noticed a red smudge on the brown envelope. Barnett

testified that on the way to the store, Sanders asked him if they wanted to see a body in "the bottoms." In Barnett's statement, he said that Sanders told him that he had killed the guy he lived with. Barnett's testimony during cross-examination wavered as to whether Sanders admitted that he was the one who killed Bertsch. However, Barnett clearly testified on redirect that Sanders told him that "he killed the body."

After returning to the house on Riverview, Sanders stayed there the rest of the night. In addition to offering to sell the car, Sanders tried to sell a refrigerator and a stove to the people at the Riverview address. The next morning Barnett woke up to the news that police "found the body in the west bottoms." Barnett testified that Sanders was in the front room on the floor asleep and Barnett woke his girlfriend with the thought that "baby, he really did it." Someone telephoned Barnett that morning, telling him the police were on their way over to the Riverside address looking for the car and for Sanders. Barnett said Sanders reacted in a "real nervous" manner upon hearing that, and that "he got up, put on his shoes . . . looked out the door and . . . was gone . . . ."

Bertsch's car was not at the Riverview address when Sanders left. Someone had given Sanders crack cocaine in exchange for the use of it, and they had not returned it. On Monday, February 1, 1999, police found Bertsch's car at a towing company. The rear bumper and trunk were stained with blood, and police found various items in the trunk, including documents concerning Bertsch.

Subsequent DNA analysis of blood found on the items gathered by police was inconclusive, due to a malfunction of the DNA analysis machine.

Dr. Sam Gulino, a forensic pathologist with the office of the medical examiner for Jackson, Clay, and Platt Counties, Missouri, determined that Bertsch's homicide resulted from blunt trauma from a weapon sometime prior to midnight or 12:30 a.m. Gulino noted that defensive wounds were present on Bertsch's right forearm and hand. Additionally, the State asked Gulino to explain where the beating began. Gulino stated that, based on the injuries to Bertsch's neck and shoulders, it was possible that at some point during the attack he was either partially kneeling on the floor with

his head on the fold-out bed or was lying on the bed with his head hanging over the side. Thus, the rails of the bed could have caused the bruising and lacerations to his neck and upper chest. Gulino indicated that the beating probably started in one area of the bed and finished in another. Gulino testified that the areas of bruising found on Sanders' hands were consistent with what he would expect from an assailant beating a victim with a weapon. He also noted that the injuries to Bertsch's collarbone had a pattern of stripes which would be consistent with a weapon such as a pipe with threads on it.

A jury convicted Sanders of first-degree premeditated murder. He subsequently received a hard 40 sentence. This appeal followed.

## I. VOLUNTARINESS OF STATEMENT

The ultimate issue of voluntariness of a confession is a legal question requiring independent appellate determination. See *Arizona v. Fulminante*, 499 U.S. 279, 287, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991); *State v. Vandiver*, 257 Kan. 53, 57-58, 891 P.2d 350 (1995). " 'In reviewing a trial court decision regarding the suppression of evidence, we review the factual underpinnings of the decision by a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment.' [Citations omitted.]" *State v. Baston*, 261 Kan. 100, 104-05, 928 P.2d 79 (1996).

This court has developed general rules for evaluating whether a confession is voluntary:

" 'In determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused.' [Citation omitted.]" *Baston*, 261 Kan. at 105.

A *Jackson v. Denno* hearing was held prior to trial. At that hearing, Sanders testified that during the two occasions he was transported from the jail to the police department he asked for an attorney and Mast simply responded by asking Sanders whether he had an attorney. Sanders stated that he felt intimidated during the interview because the police officers were all armed. In addition to describing the circumstances of this interview, he described a prior arrest and statement given to police without an attorney:

"Q. Okay. Did you ask for an attorney in that case?

"A. Yes, I did. And that's the one—the reason I had a problem giving him a statement because I told him I was shafted in that one when I asked for an attorney, they decided to take—they did an interview prior to getting the attorney and they used that against me.

"Q. Okay. And you had that experience during the interview this time, right?

"A. Yep.

"Q. And you knew that if you asked for an attorney, they couldn't interview you, right?

"A. And that's what I did.

"Q. Okay. So your testimony is you asked for an attorney, but then you went ahead and gave a statement anyway?

"A. Yeah, because I didn't know it was on the record. It was just—he was taking notes is all he was doing.

"Q. Okay. And how about the time they had a secretary actually sitting there typing away?

"A. That one I knew it was on the record.

"Q. Okay. You didn't ask for an attorney at that time?

"A. No, I didn't. Thought I only had to ask once."

Sanders further testified that the only reason he could recite for talking to the detectives without an attorney was "ignorance." Mast, however, testified that Sanders never asked for an attorney. Reviewing the conflicting testimony, the trial court found Mast's testimony to be more believable and that Sanders knowingly signed a valid waiver of his right to counsel and his right to remain silent and then proceeded to make his statement.

"If there is substantial competent evidence to support the trial court's findings that the defendant voluntarily, knowingly, and intelligently waived his rights, such findings will not be disturbed on appellate review. [Citation omitted.]" *State v. Esquivel-Hernandez*, 266 Kan. 821, 826, 975 P.2d 254 (1999). It is not this court's func-

tion to reweigh the evidence, but rather to determine whether the trial court's finding is supported by substantial competent evidence.

" 'Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, "substantial evidence" is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.' " *In re Estate of Reynolds*, 266 Kan. 449, 461, 970 P.2d 537 (1998) (quoting *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 [1993]).

Here, supporting evidence validates the lower court's decision. Sanders was approximately 24 years of age at the time he made and signed the statement, and there is no indication that Sanders' level of intellect is such that it would be unreasonable to believe he could not make a voluntary statement of his own free will. Sanders' testimony during the *Jackson v. Denno* hearing established that he knew that police must stop the interview upon his request for an attorney. Sanders argues that despite his knowledge that police must stop their interview upon a request for counsel, he proceeded to give a statement to the detectives, out of sheer ignorance, after unsuccessfully requesting the assistance of counsel. Testimony given by Mast contradicts that of Sanders, indicating that Sanders never asked for an attorney. Significantly, both witnesses testified that Mast had previously returned Sanders to the jail upon his request to terminate the first interview. This serves to verify (1) Mast's compliance with procedural safeguards and (2) Sanders' knowledge that the interview could be terminated at any time he wished. Sanders' actions indicate both an awareness of his rights and a conscious choice to waive them. We find that Sanders voluntarily waived his *Miranda* rights and that the trial court's admission of his statement was not in error.

## II. PREMEDITATED MURDER

Sanders also contends that the evidence produced at trial was insufficient to support a finding that he committed the murder of Bertsch with premeditation.

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citation omitted.]" *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000).

"A verdict of guilty in a criminal case will not be disturbed on appeal if there is substantial evidence, even though the evidence is entirely circumstantial." *State v. Dunn*, 249 Kan. 488, 491, 820 P.2d 412 (1991).

"The probative values of direct and circumstantial evidence are intrinsically similar, and there is no logically sound reason for drawing a distinction as to the weight to be assigned to each. [Citation omitted.] When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. [Citation omitted.]" *State v. Juiliano*, 268 Kan. 89, 97, 991 P.2d 408 (1999).

The elements of first-degree murder are set forth in K.S.A. 21-3401: "Murder in the first degree is the killing of a human being committed: (a) Intentionally and with premeditation." Thus, the State was required to prove that Sanders killed Bertsch intentionally and with premeditation. Although there were no witnesses who saw Sanders kill Bertsch, sufficient circumstantial evidence exists so that a rational factfinder could have found that Sanders intentionally killed Bertsch.

Bertsch's house had a deadbolt lock, and it was his habit to keep the house locked even when he was at home. Sanders testified that Bertsch shut the doors when he left. There was no sign of a forced entry at the residence, and because four necklaces were found on the body, robbery was not a likely motive for the killing. Bertsch had given Sanders a key to the back door. In addition, although Sanders testified that Bertsch had given him $15 to purchase more crack cocaine, Barnett testified that Sanders did not have any money the second time he visited the Riverview residence. When he showed up at the Riverview residence sometime after midnight on January 29, Sanders was driving Bertsch's car and tried to sell the car, a refrigerator, and a stove to get money to purchase more drugs. Sanders expressed to both Amanda and Saraphine that he originally wanted to use Bertsch's car but that Bertsch would not let him.

The record provides further direct and circumstantial evidence. Barnett testified that Sanders said "he killed the body." Moreover, Sanders attempted to clean up the scene of the crime and disposed of the body in the west bottoms of Kansas City, Missouri. At the time of his arrest, blood was on Sanders' clothes which he indicated was Bertsch's blood. Cuts and bruises were on Sanders' hands, which Gulino explained would be consistent with what he would expect on an assailant who administered a beating. When viewed in a light most favorable to the prosecution, a rational factfinder could believe that Sanders intentionally killed Bertsch.

The next matter for consideration is whether Sanders acted with premeditation. " 'Premeditation under the law does not require any specific time frame.' " *State v. Moncla,* 262 Kan. 58, 72, 936 P. 2d 727 (1997) (quoting *State v. Kingsley,* 252 Kan. 761, 851 P.2d 370 [1993]). Sanders' theory is that because all the facts under which the killing occurred are unknown, there is no evidence to prove that the killing was carried out in a premeditated fashion.

In *State v. Saleem,* 267 Kan. 100, 105, 977 P.2d 921 (1999), we stated that "[p]remeditation 'is a state of mind' relating to a person's reasons and motives for acting as he or she did." There, this court found sufficient evidence of premeditation where the defendant instigated the fight, had sufficient time to think about his actions as he rose from the ground, and responding with deadly force, shot the victim not one but four times. 267 Kan. at 106.

Here, the State's theory is that Sanders developed a motive to kill Bertsch because he wanted to use his car for a date with Amanda on Saturday, but Bertsch repeatedly refused to let him use it. The State asserts that premeditation may be inferred from the circumstances surrounding the homicide, in particular the dealing of lethal blows after Bertsch was rendered helpless.

In *State v. Murillo,* 269 Kan. 281, 286, 7 P.3d 264 (2000), this court stated:

" 'The evidence of premeditation need not be direct and often is established by circumstantial evidence. A conviction of even the gravest offense may be sustained by circumstantial evidence. [Citation omitted.] Premeditation cannot be inferred from the use of a deadly weapon alone; it may be inferred where other circumstances also exist. [Citation omitted.] Circumstances which may give rise

to the inference of premeditation include: (1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. [Citation omitted.]'

. . . .

" '. . . The jury has a right to infer premeditation from the established circumstances of the case provided the inference is a reasonable one.' " *Murillo*, 269 Kan. at 286 (quoting *State v. Cravatt*, 267 Kan. 314, 328-29, 979 P.2d 679 [1999]).

Therefore, it is necessary to review the circumstances giving rise to the inference of premeditation:

(1) *Nature of the weapon.* Gulino testified that he could not tell for certain what kind of weapon was used on Bertsch. However, he testified, "The only patterns that we do have are the three linear areas on his right cheek and the injury over his left collarbone which had some little—it was a scrape that had some sort of stripes in it, a pattern that you can sometimes see with something that has threads on it such as a pipe with thread on the end . . . ." The murder weapon was never located by police.

(2) *Lack of provocation.* To mitigate murder to manslaughter, there must be provocation "calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than reason." *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985). In his brief, Sanders argues there was no evidence of provocation in this murder and that it is possible the killing was spontaneous. The State's theory of the case was that Sanders killed Bertsch to gain access to his car for an outing with Amanda. When viewed in a light most favorable to the prosecution, a rational factfinder could reasonably find a lack of provocation for this killing.

(3) *Conduct before and after the killing.* One week before the homicide, Bertsch had to walk to work when Sanders took his car without permission. Sanders wanted to get Bertsch's car so he could meet Amanda on the Saturday following the murder. Saraphine said that Bertsch would not let Sanders take the car because Sanders had not returned the car for 2 or 3 weeks the last time he borrowed the car. After the homicide, Sanders dumped Bertsch's almost nude body 3 feet from the street in the west bottoms area of Kansas City, Missouri. Later that night, he indicated to his ac-

quaintances that he had title to Bertsch's car and tried to sell the car, a refrigerator, and a stove. He also asked them if they wanted to see a body and told Barnett that he "had killed the body." In addition, Sanders attempted to evade the police the next morning and appeared nervous when he heard police were on their way to the Riverview residence. After Mast made arrangements to gather Sanders' clothes to test for blood and to photograph the bruises on Sanders' hands, Sanders indicated that he had not been truthful initially and wanted to make a statement.

(4) *Threats and declarations of Sanders before and during the occurrence.* The record does not indicate any threats or declarations were made by Sanders before the occurrence. However, Barnett testified that Sanders told him that "he killed the body."

(5) *Dealing lethal blows after Bertsch was felled/rendered helpless.* Here, Bertsch was struck in the head and body numerous times on the skull, face, back, ribs, and arm. The severity of the beating and the repetitive nature of the abuse inflicted to the body indicate that the beating continued for some time.

Gulino characterized one injury to Bertsch's right forearm as a defensive injury. Furthermore, Gulino believed the attack began on one side of the bed and ended on another. There was no direct testimony establishing whether possible movement of Bertsch's body was voluntary or involuntary, *i.e.*, a result of the force of the beating, or from Bertsch attempting to escape the attack.

In light of the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found Sanders guilty of premeditated murder beyond a reasonable doubt.

## III. SPEEDY TRIAL

The next issue for determination is whether the trial court erred in denying Sanders' motion to dismiss alleging violations of his constitutional and statutory rights to a speedy trial. "This issue involves a question of law, over which we have unlimited review." *State v. Smith*, 271 Kan. 666, 681, 24 P.3d 727 (2001).

Kansas follows the four-point analysis found in *Barker v. Wingo*, 407 U.S. 514, 530, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972), for claims of a violation of the right to speedy trial under the Sixth

Amendment to the United States Constitution. In that case, more than 5 years passed from the time of Barker's arrest until his trial. In Kansas, delays of a little more than a year are held not clearly presumptively prejudicial to the defendant's right to a speedy trial. *Smith*, 271 Kan. at 683; *State v. Hill*, 257 Kan. 774, 778-79, 895 P.2d 1238 (1995); *State v. Goss*, 245 Kan. 189, 193, 777 P.2d 781 (1989). Here, less than 9 months passed between Sanders' arrest on February 2, 1999, and the trial date of October 25, 1999. Therefore, the length of delay is not presumptively prejudicial, and there is no necessity for further inquiry into the balancing test. *State v. Green*, 260 Kan. 471, 473-74, 920 P.2d 414 (1996). There was no violation of Sanders' constitutional right to a speedy trial.

The next consideration is Sanders' statutory right to a speedy trial. Sanders asserts that sometime in mid-July, his confinement for parole violation expired. Since, at that time, he was being held in jail solely on the charge of first-degree murder, Sanders contends that the State had 90 days from mid-July to bring him to trial, which it failed to do. In essence, Sanders' contention is that K.S.A. 22-3402's 90-day mandate should start running again after a defendant has completed any jail time due to crimes other than the subject criminal charge. The State's position is that the statute cannot be read that way. Because Sanders' initial incarceration was not solely for the crime charged of first-degree murder, the State argues that K.S.A. 22-3402 would not apply to him.

K.S.A. 22-3402, in pertinent part, reads:

"(1) If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within ninety (90) days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (3).

. . . .

"(3) The time for trial may be extended beyond the limitations of subsections (1) and (2) of this section for any of the following reasons:

. . . .

(c) There is material evidence which is unavailable; that reasonable efforts have been made to procure such evidence; and that there are reasonable grounds to believe that such evidence can be obtained and trial commenced within the next

succeeding ninety (90) days. Not more than one continuance may be granted the state on this ground, unless for good cause shown . . . ."

We believe this question is resolved by *State v. Brown*, 266 Kan. 563, 571-72, 973 P.2d 773 (1999). In *Brown*, the defendant was arraigned on March 22, 1996, and his case was set for trial on June 17, 1996 (within 90 days). On June 6, he obtained a continuance in order to send material away for DNA testing. The motion was granted for an 89-day continuance. The trial court heard arguments similar to what we have before us and held:

"The evidence attempted to be obtained under K.S.A. 22-3402(3)(c) was material. This did not change when the testing or lack of it did not result in admissible evidence. See *State v. Green*, 254 Kan. 669, 674, 867 P.2d 366 (1994) (continuance proper even though State did not introduce DNA evidence). The State is not required to show that the evidence meets the *Frye* test before its requested continuance can be granted. It is entitled to attempt to match the bones and teeth fragments found at the crime scene to the victim's DNA. The continuance was properly granted. The speedy trial right was not violated." 266 Kan. at 571-72.

In *Green*, we held:

"Cortez was arraigned December 14, 1990. Trial was originally set for February 25, 1991. On that date, the trial was continued to March 18, 1991. On February 28, 1991, the State filed a motion to extend the time to bring defendant to trial by 30 days because the DNA test results from Life Codes, Inc., would not be available until March 11, 1991. The State's motion for a 30-day continuance to obtain the evidence was granted. On March 27, 1991, the State filed a second motion to extend the time required to bring the defendant to trial because material evidence was not available, this time requesting an extension of 90 days. In its motion, the prosecution stated that the DNA test results from Cellmark Diagnostics would not be available prior to April 8, 1991, and, in addition, one of the State's witnesses, Dr. James Bridgens, a forensic pathologist, was out of the United States until April 23, 1991. The State's motion for a second continuance was also granted by the court. Cortez's trial commenced on June 24, 1991, within 120 days after the original February 25, 1991, trial setting.

"Where material evidence is unavailable and reasonable efforts have been made to procure the evidence, a second continuance ordered by the court is reasonable and proper where the first continuance was for less than 90 days and the trial commenced within 120 days from the trial date on which the first continuance was granted. See *State v. Welch*, 212 Kan. 180, 509 P.2d 1125 (1973). Defendant's trial was commenced within the period allowed by K.S.A. 22-3402(3).

. . . .

"When Cortez's trial commenced, the State admitted that because of the expense it would not introduce the DNA test evidence. Cortez renewed his claim that his right to a speedy trial had been denied and now argues the DNA evidence was not material; therefore, the State's requests for continuances were not necessary. We disagree. Cortez was brought to trial within the statutory period. There is no suggestion that the State did not intend to use the DNA evidence at trial or requested the continuances to gain an advantage. The continuances granted to the State to obtain the evidence did not violate Cortez's statutory or constitutional rights to a speedy trial." 254 Kan. at 672-75.

We hold that under the facts of this case, Sanders' statutory and constitutional rights to a speedy trial were not violated.

## IV. CONSTITUTIONALITY OF A HARD 40 SENTENCE

On appeal, Sanders challenges the constitutionality of the Kansas hard 40 sentencing statute.

"Determining whether a statute violates the constitution is a question of law. When determining a question of law, this court may exercise an unlimited de novo standard of review." *Lemuz v. Fieser*, 261 Kan. 936, Syl. ¶ 1, 933 P.2d 134 (1997). This court recently held in *State v. Conley*, 270 Kan. 18, Syl. ¶ 3, 11 P.3d 1147 (2000), that the Kansas hard 40 sentencing statute violates neither the Sixth Amendment right to jury trial nor the Fourteenth Amendment Due Process Clause of the United States Constitution. In addition, this court held in *Conley* that the hard 40 sentencing statute does not violate § 5 of the Kansas Constitution Bill of Rights. 270 Kan. 18, Syl. ¶ 3. Thus, Sanders' argument fails.

## V. AGGRAVATING CIRCUMSTANCES

The final matter for consideration is Sanders' contention that the trial court erred in finding that aggravated factors existed justifying the imposition of the hard 40 sentence pursuant to K.S.A. 21-4638. Pursuant to K.S.A. 21-4635, convicted defendants are subject to a mandatory term of imprisonment of 40 or 50 years in one of two situations. The first is when "a defendant is convicted of the crime of capital murder and a sentence of death is not imposed . . . ." K.S.A. 21-4635(a). The second is when "a defendant is convicted of murder in the first degree based upon the finding of premeditated murder . . . ." K.S.A. 21-4635(a). Here, a jury convicted Sanders of premeditated murder in the first degree un-

der K.S.A. 21-3401, making it necessary for the trial court to determine whether to sentence Sanders to a mandatory term of imprisonment of 40 years. In making its determination, "the court may be presented evidence concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4636 and amendments thereto and any mitigating circumstances." K.S.A. 21-4635(b).

The transcript of the sentencing hearing reveals that the court found that this crime was committed in an especially heinous, atrocious, and cruel manner under K.S.A. 21-4636(f) because Bertsch "was beaten to death," and because "the defendant took Mr. Bertsch or Mr. Bertsch's body, if he was dead at that point, took him and dumped him by the side of the road." Here, Sanders contends that there was insufficient evidence to support the trial court's finding that he committed the crime in an especially heinous, atrocious, or cruel manner.

The version of the hard 40 statute in effect at the time of this crime does not contain a requirement that the trial court use the beyond-a-reasonable-doubt standard when determining that one or more aggravating circumstances existed. "When the legislature eliminated the jury from the determination, it removed the express standard of proof." *State v. Spain*, 263 Kan. 708, 711, 953 P.2d 1004 (1998). Because the hard 40 statute does not increase the prescribed penalty, but only changes the mode in which it is carried out, the factual determination of aggravating circumstances need not be proven beyond a reasonable doubt in order to comply with the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). "We review all the sentencing evidence, viewed in the light most favorable to the State. If we conclude a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance, we must affirm." *Conley*, 270 Kan. at 27.

"All murders are heinous, atrocious, and cruel." *State v. Cook*, 259 Kan 370, Syl. ¶ 9, 913 P.2d 97 (1996). "However, exceptional circumstances must exist before a murder can be classified as 'es-

pecially heinous, atrocious or cruel.' " *State v. Spry*, 266 Kan. 523, 531, 973 P.2d 783 (1999). " 'The hard 40 sentence should be reserved for special cases . . . . Otherwise, the legislature would have mandated the hard 40 sentence in all first-degree murder cases.' " 266 Kan. at 531 (quoting *State v. Willis*, 254 Kan. 119, 129, 864 P.2d 1198 [1993]).

The legislature amended the language of K.S.A. 21-4636(f) effective July 1, 1999, to provide further elucidation of "especially heinous, atrocious or cruel manner." However, it must be noted that "[c]riminal statutes and penalties in effect at the time of a criminal offense are controlling." *State v. Sisk*, 266 Kan. 41, 44, 966 P.2d 671 (1998). This crime was committed on or about January 29, 1999, so the 1999 amendment to K.S.A. 21-4636(f) does not apply to this case. Therefore, we look to case law to define what constitutes an especially heinous, atrocious, or cruelly committed crime.

"A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a victim's uncertainty as to [his] or [her] ultimate fate." *Willis*, 254 Kan. 119, Syl. ¶ 4.

In *Spry*, this court noted that "case law has consistently held that, in order to establish the murder as 'especially heinous, atrocious, or cruel,' *a victim must suffer serious physical abuse or mental anguish before death.*" 266 Kan. at 531-32. In *Spry*, the defendant used an axe to strike the victim in the head as she was lying face down in her bed. There was no evidence that she suffered repeated blows while she was alive or whether she was awake at the time of the attack.

Here, the autopsy photographs evidence the vicious repeated blows to Bertsch's back, skull, and the side of his face. Gulino testified there was bruising on his right forearm due to defensive posturing. Gulino indicated that he believed the beating began on one side of the fold-out bed and ended on another. He testified that it was possible that the injuries to Bertsch's neck and chest were due to being beaten while hanging over the side of the bed. There were blood splatters on the walls, ceiling, floor, bedding,

and on Sanders' clothing. Sanders had bruises on the palms of his hands from holding an object he hit Bertsch with. The crux of this matter is whether Bertsch suffered serious physical abuse or mental anguish before death.

We hold the judge could have reasonably concluded that Sanders inflicted serious physical abuse on Bertsch before his death. The trial court did not err in imposing the hard 40 sentence.

Affirmed.

ALLEGRUCCI, J., concurs in the conviction and dissents to the imposition of the hard 40 sentence.